[Civ. No. 19850. First Dist., Div. One. Oct. 11, 1962.]

CAHILL BROTHERS, INC., Plaintiff and Respondent, v. CLEMENTINA COMPANY, Defendant and Appellant.

Carroll, Davis, Burdick & McDonough and J. D. Burdick for Defendant and Appellant.

Daniel J. O'Brien, Jr., Daniel J. O'Brien III and Edward Molkenbuhr, Jr., for Plaintiff and Respondent.

MOLINARI, J.—This is an appeal from a judgment for $17,609.73, plus interest and costs, on a jury verdict for plaintiff and respondent, Cahill Brothers, Inc., a corporation, hereinafter referred to as Cahill, against defendant and appellant, Clementina Company, a corporation, hereinafter referred to as Clementina.

### The Facts

J. Peter Cahill, hereinafter referred to as Peter, owned certain buildings at Kearny and Sacramento Streets in San Francisco, California, which he desired to have demolished so that he could construct a new building on the site. He entered into a contract with Cahill, which was headed by his father, John R. Cahill, hereinafter referred to as John, for such demolition and construction work upon a cost plus 3 per cent fee basis.

Cahill had in its employ for over 40 years one Edwin A. Larkin, hereinafter referred to as Larkin. For many years prior to the accident which is the subject of this action, Larkin had acted as general superintendent for Cahill with whom he enjoyed a position of trust and confidence. Because of this relationship Cahill had from time to time permitted Larkin

to engage in other business activities continuing all the while his said employment with Cahill. Among these was the formation in 1941, with two other persons, of a partnership known as Clementina Company for the purpose of renting construction equipment. In 1946 Clementina was incorporated; and at the time of the accident in October 1956 which brought about this litigation, there were 19 stockholders besides Larkin, who was then the owner of 46 per cent of its stock. Neither Cahill, nor any of its employees, other than Larkin, owned any interest or stock in Clementina.

In 1950 Clementina commenced doing demolition work for other contractors including Cahill. Its contracts with Cahill were always oral, on an informal basis and without the submission of bids. Clementina had only two permanent employees: Larkin, who was its managing officer, and an office girl. It was Clementina's practice to hire such employees as it needed for a particular demolition job, and on numerous occasions it would "borrow" employees from Cahill. At first, whenever employees of Cahill were "borrowed" they were paid directly by Clementina, but in later years they were paid by Cahill under its payroll, because Cahill's employees enjoyed a union contract with Cahill which contained welfare provisions, while Clementina had no such union contract. In these instances it was the practice of Cahill to charge such wages back to Clementina " 'in the final adjustment' " for the particular demolition job done for Cahill. The evidence discloses that in demolition jobs done for Cahill, Clementina did so usually on a cost plus 10 per cent basis, subject to final adjustment, with offsets to the credit of Cahill for wages to employees under the aforesaid arrangement and for the sums realized from salvaged materials. Clementina owned certain land on which it maintained its office and area for its materials and equipment. A portion of this area was rented to Cahill for a small separate office building.

On or about September 15, 1956, Cahill orally contracted with Clementina to do the demolition work on Peter's property. Under this contract Clementina was to completely wreck the existing buildings, sell the salvage, and render an accounting as to the amount recovered for salvage. Cahill, on the other hand, was to pay the demolition cost "plus a fee to be determined." The required demolition permits were taken out by Cahill in its name. The first work done on the job was by Cahill's men and consisted of the removal of furniture and plumbing from the buildings about to be demolished. There-

after the demolition work commenced. From the inception of the job for Peter at said site, Larkin was acting as general superintendent for Cahill on a salary basis. He was acting, as testified by him, ''in a dual capacity''—as general superintendent for Cahill and as ''the responsible and managing officer of Clementina.'' Larkin testified further: that Clementina was doing the demolition work ''as a subcontractor''; that ''[e]verything in connection with the job was within my control, and I am Clementina Company and also Cahill Brothers''; that it ''is up to my judgment as to what work I would put on the Cahill work and what part I would do on my own''; and that he was looking out for Cahill Brothers' interests in doing the demolition job and was attempting to ''hold the cost down'' as well as he could.

In the course of the subject demolition job and in his capacity as such superintendent for Cahill, Larkin ordered several of Cahill's employees to engage in the demolition work which work was a ''part of his job.'' Among these employees were two carpenters, Robert J. Dobson and Kenneth Wellman. While performing demolition work each was acting in the capacity of a foreman. Both testified that in the demolition work they took orders from Larkin and that during such work they considered themselves employees of Clementina, although their payroll checks on this job were issued by Cahill. Each testified that they had worked under such an arrangement previously, shifting from Cahill's employment to that of Clementina, during the demolition work, upon the completion of which they went back to Cahill's employ. They also testified that prior to the establishment of the aforesaid union welfare plan their checks were issued by Clementina, Wellman testifying that this was the first demolition job in which he received his payroll check from Cahill.

Larkin testified that Dobson and Wellman were ordered on this demolition job by him in his capacity as their superior at Cahill; that Wellman was directed by him ''to keep the job well barricaded''; that barricades were erected by Dobson and Wellman, the lumber for the same being furnished by Cahill pursuant to his order as superintendent for Cahill; that the barricades were put up for purposes of protecting the public from falling into any openings or getting into any of the stores which were still occupied by some of the tenants in the buildings about to be demolished; that he instructed Wellman and Dobson ''to keep the place protected,'' and that in doing so they were protecting ''Cahill's interests''; and that the

barricading was done for and on behalf of Cahill, although in another instance he stated that barricading was the type of work he "was supposed to do; . . ." There was a conflict as to whether there were both Cahill and Clementina signs affixed to the barricades. Larkin testified further that one of the reasons Clementina was engaged to do the demolition work instead of an outside demolition firm was the presence of tenants who were still in occupancy on the sidewalk level of the building; that "[a]n outside man wouldn't try to protect tenants"; and that the barricade was constructed in the manner in which it was (without a canopy) so as not to block the doorways of the tenants.

Despite such barricade, on Sunday, October 7, 1956, while demolition work was in progress, one William Hull, a pedestrian, was injured when he fell into an excavation on said job site. Hull brought suit against both Cahill and Clementina alleging that his injuries were due to their negligence in failing to provide adequate safeguards for pedestrians. After a trial Hull was awarded a judgment for $30,000, plus costs against both Cahill and Clementina. Said judgment was satisfied by the payment of the sum of $15,576.66 by Cahill and a like sum by Clementina, said sum representing one-half of the judgment, costs and accrued interest. Cahill thereupon filed this present action against Clementina for indemnification, seeking recovery of said sum of $15,576.66, plus the sum of $2,033.07 expenses incurred in defending the Hull action, or a total of $17,609.73. The latter sum was awarded to Cahill by a jury in the instant action.

Before proceeding to the questions and contentions presented on this appeal, it should be noted that the evidence further disclosed that the total cost of the said demolition work amounted to $25,276.38, and that the labor charge for the carpenters "borrowed" by Clementina from Cahill amounted to $2,838.92. The aggregate of these sums, i.e., $28,115.30, less a credit of $558.07 for lumber salvage, or a net of $27,557.23, was billed to Peter by Cahill. Peter was also charged with the sum of $2,723.62 as Clementina's fee. This sum of $2,723.62 represented the amount accounted to Cahill by Clementina as the amount received by the latter for salvage, and because the said sum approximated the 10 per cent fee which it was agreed Clementina should receive, the respective credits were allowed by agreement between Cahill and Clementina to offset each other without the necessity of exchanging payments.

As established by the pretrial conference order, Cahill contends that Clementina was its subcontractor, and as such solely responsible for the demolition work, while Clementina, on the other hand, asserts that the two corporations were joint venturers in such work. The essence of Cahill's cause of action, as advanced in the court below, was that Clementina, as such a subcontractor, was solely at fault with respect to Hull's injuries and therefore was obligated to indemnify Cahill for the latter's portion of the satisfied judgment and its expenses incurred in defending the Hull action. Clementina's defense, in substance, was there predicated upon its claim that Clementina and Cahill were joint venturers, who, as joint tortfeasors equally liable to Hull, were jointly at fault in contributing to Hull's injuries so as to preclude any right of indemnity.

### Questions Presented

Two questions are presented on this appeal:

(1) Did the evidence in this case warrant the submission of the issue of indemnity to the jury?

(2) Did the trial court err prejudicially in its instruction to the jury to the effect that the defendant, Clementina, had the burden of proving that it was not an independent contractor but was instead engaged in a joint venture with Cahill?

### The Right to Indemnity

The gist of appellant's contention on appeal is that the uncontroverted evidence establishes as a matter of law that Cahill is not entitled to indemnity. Three arguments are advanced in support of the assertion, to wit: (1) That indemnity is improper when respondent's own fault contributed to the injury; (2) that respondent had knowledge of, acquiesced to, and participated in the negligent acts; and (3) that the admissions in respondent's verified complaint are binding on respondent and preclude indemnity as a matter of law. With respect to the last point, it is claimed that the verified admission in Cahill's amended complaint in its cause of action against Larkin (dismissed with prejudice prior to trial), to the effect that Larkin was operating on behalf of both respondent and appellant is binding as a matter of law.

The right to implied indemnity, while relatively recent in the law of California, is now well established. (See *Peters* v. *City & County of San Francisco*, 41 Cal.2d 419 [260 P.2d 55]; *City & County of San Francisco* v. *Ho Sing*, 51 Cal.2d 127 [330 P.2d 802]; *San Francisco Unified Sch. Dist.*

v. *California Bldg. etc. Co.,* 162 Cal.App.2d 434 [328 P.2d 785] ; *De La Forest* v. *Yandle,* 171 Cal.App.2d 59 [340 P.2d 52] ; *Alisal Sanitary Dist.* v. *Kennedy,* 180 Cal.App.2d 69 [4 Cal.Rptr. 379] ; *Montgomery Ward & Co.* v. *KPIX Westinghouse Broadcasting Co.,* 198 Cal.App.2d 759 [18 Cal.Rptr. 341] ; *American Can Co.* v. *City & County of San Francisco,* 202 Cal.App.2d 520 [21 Cal.Rptr. 33] ; *Pierce* v. *Turner,** 205 Cal.App.2d 264 [23 Cal.Rptr. 115].) ▮ The distilled essence of these cases is that where each of two persons is made responsible by law to an injured party the one to whom the right of indemnity inures is entitled to shift the entire liability for the loss to the other party. ▮ Accordingly, a right of implied indemnification may arise as a result of contract or equitable considerations. (*Peters* v. *City & County of San Francisco, supra,* 41 Cal.2d 419, 431; *City & County of San Francisco* v. *Ho Sing, supra,* 51 Cal.2d 127, 130; *Alisal Sanitary Dist.* v. *Kennedy, supra,* 180 Cal.App.2d 69, 76; *Pierce* v. *Turner,** *supra,* 205 Cal.App.2d 264, 268; *Ryan Co.* v. *Pan-Atlantic Corp.,* 350 U.S. 124 [76 S.Ct. 232, 100 L.Ed. 133] ; *Weyerhaeuser S. S. Co.* v. *Nacirema Co,* 355 U.S. 563 [78 S.Ct. 438, 2 L.Ed.2d 491].) It appears, at first blush, that the rationale of the cases which have considered the right of implied indemnity rests upon a difference between the primary and secondary liability of two persons each of whom is made responsible by the law to an injured party. (*Alisal Sanitary Dist.* v. *Kennedy, supra,* 180 Cal.App.2d 69, 75; *Pierce* v. *Turner,** *supra,* 205 Cal.App.2d 264, 268; *American Can Co.* v. *City & County of San Francisco, supra,* 202 Cal.App.2d 520, 525; *Builders Supply Co.* v. *McCabe,* 366 Pa. 322, 325-326 [77 A.2d 368].) ▮ A closer scrutiny discloses, however, that where the right of implied indemnity rests upon a *contractual* relationship between the person seeking and the one resisting indemnity it is not necessary or appropriate to apply the theories of primary or secondary liability. (*Ryan Co.* v. *Pan-Atlantic Corp., supra,* 350 U.S. 124, 133; *Weyerhaeuser S.S. Co.* v. *Nacirema Co., supra,* 355 U.S. 563, 569; *San Francisco Unified Sch. Dist.* v. *California Bldg. etc. Co., supra,* 162 Cal.App.2d 434, 447.)

In both *Ryan* and *Weyerhaeuser* it was held that a shipowner could claim indemnity against a stevedoring company whose employee had recovered a judgment against the shipowner for injuries sustained in the course of his employment connected with the unloading of a vessel. These cases held

---

*Cited as *Haines* v. *Pierce.*

that notwithstanding the absence of an express agreement of indemnity, the stevedoring company could be held liable for reimbursement to the shipowner for the amount of the judgment against the latter where the injuries to the longshoreman resulted from the unsafe stowage of cargo (in *Ryan*), and an unsafe winch shelter erected by the stevedoring company (in *Weyerhaeuser*). Liability was there predicated upon breach of the stevedoring contract, the rationale being that such contract necessarily implied an obligation to perform the stevedoring services contracted for with reasonable safety, and to discharge foreseeable damages resulting to the shipowner from the contractor's improper performance and not flowing from the shipowner's negligence. It was further held that the evidence bearing on these issues was for jury consideration under appropriate instructions.

The *San Francisco Unified Sch. Dist.* case relied upon the reasoning of *Ryan* and *Weyerhaeuser*, holding that a prima facie case for indemnity had been made by the school district plaintiff against the defendant maintenance company for damages which the district was compelled to pay to an employee of the maintenance company who had been injured while washing the windows of a high school. There the company contracted and agreed to wash the windows from the inside from stepladders but failed to furnish such ladders to its employees. The court held that the contract was breached, and that the damages flowing to the district from such breach were subject to indemnification under a warranty or agreement to indemnify necessarily implied in the contract. The *Alisal* case involved the sufficiency of a complaint for indemnity. There, too, the gist of the complaint was the breach of the defendant's contract with the plaintiff, the obligation allegedly breached being the performance of engineering work for the plaintiff in a skillful, expert and careful manner. In the *De La Forest* case the court relied on the *San Francisco Unified Sch. Dist.* case in holding that where the injury to a third party arises from a violation of a contractual duty owed by one tortfeasor to another, the latter may recover from the former. That case involved the sufficiency of a complaint wherein it was alleged in substance: that the plaintiff truck owner engaged the plaintiff repair shop owner to repair a worn trailer axle, the latter subletting the work to the defendants who held themselves as qualified, equipped, skilled and expert in their crafts; that the axle was reinstalled on the trailer and thereafter failed causing the trailer to strike an automobile and

injuring its occupants; that the work of defendants was negligently done and the axle was unsafe for use; and that plaintiffs were sued by the injured parties and thereafter in good faith compromised said action. The court held that the complaint stated a cause of action for indemnity for the amount paid in settlement. *Montgomery Ward* likewise involved an action based upon the alleged breach of an implied agreement to indemnify. The court there relied upon *Ryan, Weyerhaeuser, San Francisco Unified Sch. Dist., De La Forest* and *Alisal* in holding that implicit in a written agreement between plaintiff and defendant for the origination by the latter of a telecast from the plaintiff's premises was the accompanying duty, on the part of the defendant, to perform the work in a safe manner, which duty, in turn, carried with it an implied agreement to discharge foreseeable damages resulting to one of its own employees from its negligent performance while said employee was performing such work on plaintiff's premises.

*Ho Sing* was the first California case to consider noncontractual implied indemnity. The court there concluded ''that where an adjoining property owner for the exclusive benefit of his own property places in a public street or sidewalk some artificial structure and a city is compelled to pay compensation in damages to a member of the public injured thereby the city has a right to recover the amount so paid from the property owner by way of indemnity.'' (P. 138.) The court's ruling was predicated upon the equitable considerations of primary and secondary liability arising out of the special relationship existing between the city and the landowner in the situation where the latter negligently maintains a structure in the public sidewalk which inures only to his private benefit.

The *American Can Co.* case was the first to come to grips with the question of primary and secondary liability in rejecting a claim for implied indemnity in a situation where a vehicle owned by the plaintiff, who was seeking indemnity, had struck the defendant's improperly parked truck causing injuries to two of the latter's employees, who were on said truck and who thereafter recovered damages from the plaintiff. The court there adopted the rule of primary and secondary liability announced in *Builders Supply Co.* v. *McCabe, supra,* 366 Pa. 322, 325-326 [77 A.2d 368], and cited with approval by *Alisal,* as follows: '' ' ''The right of *indemnity* rests upon a difference between the primary and secondary liability of

two persons each of whom is made responsible by the law to an injured party. It is a right which enures to a person who, without active fault on his part, has been compelled by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable. The difference between primary and secondary liability is not based on a difference in *degrees* of negligence or on any doctrine of *comparative* negligence—a doctrine which, indeed, is not recognized by the common law; . . . It depends on a difference in the *character* or *kind* of the wrongs which cause the injury and in the nature of the legal obligation owed by each of the wrongdoers to the injured person. . . . But the important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible." ' " (P. 525 of 202 Cal.App.2d.)

The rule was reiterated in *Pierce**, where the court held that there is no right of indemnity in favor of a defendant who was himself negligent and therefore primarily liable, notwithstanding that his codefendant may also have been negligent or may have been negligent to a greater degree. In that case one Turner had employed one Pierce to fell certain lumber. In doing so Pierce negligently cut a tree so as to damage a home owned by Haines. Haines sued both Turner and Pierce and recovered a judgment against both. A writ of execution caused Pierce to satisfy the judgment in full. He thereupon sought and was granted contribution against Turner, who claimed that the court erred in doing so because he was entitled to indemnity against Pierce. Based upon the trial court's finding that Turner had negligently failed to supervise Pierce in the cutting and felling of the timber, the reviewing court held that indemnity was precluded, and that a *sharing* of the loss by way of contribution as between the two tortfeasors was proper.

It is apparent from the foregoing cases, therefore, that the right of implied indemnity in contractual cases is based upon a breach of contract by the person against whom indemnity is sought, while in the area of noncontractual in-

*Cited as *Haines*.

demnity the right rests upon the fault of another which has been imputed to or constructively fastened upon him who seeks indemnity.

An examination of the pleadings and the record in the instant case reveals that the case was tried upon the theory of contractual indemnity and that the trial court's instructions were so predicated. We are therefore not concerned with the incidents of primary and secondary liability, but rather with the question as to whether Clementina breached a contractual duty to Cahill. The evidence here was reasonably susceptible of the inference that Clementina was an independent subcontractor despite the wearing by Larkin of "two hats"; one in his capacity as general superintendent for Cahill, and the other as the responsible and managing officer of Clementina. ▮▮▮ "An independent contractor is one who renders service in the course of an independent employment or occupation, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished." (*Bates* v. *Industrial Acc. Com.*, 156 Cal.App. 2d 713, 717 [320 P.2d 167] ; Lab. Code, § 3353.) ▮▮▮ The most important factor, in determining whether one is an employee or an independent contractor, is the right to control the manner and means of accomplishing the result desired; and, in this regard, the right to discharge an employee at will, without cause, is strong evidence of the employer's control. (*City of Los Angeles* v. *Vaughn,* 55 Cal.2d 198, 201 [10 Cal. Rptr. 457, 358 P.2d 913].) Instructions requested by the respondent so defining an independent contractor and stressing the factor of such control were given by the trial court. Appellant does not, moreover, challenge the right of the trial court, under the state of the evidence, to submit to the jury the question whether or not Clementina was an independent contractor. ▮▮▮ The existence of an oral contract between Cahill and Clementina for the demolition work, and whether such contract, if found to exist, was breached by Clementina were likewise questions of fact for the jury. The propriety and sufficiency of the instructions on these issues are not under attack here.

The serious question presented is whether as a matter of law Cahill's own conduct was sufficient to preclude recovery. In this respect appellant contends that indemnity does not lie because Cahill's own fault contributed to Hull's injury. ▮▮▮ In the literature of the law " 'fault' " is synonymous with " 'negligence.' " (*Marston* v. *Pickwick Stages, Inc.*, 78

Cal.App. 526, 534 [248 P. 930] ; *Gackstetter* v. *Market Street Ry. Co.,* 130 Cal.App. 316, 323 [20 P.2d 93].) It is not enough, however, that Cahill was at fault or that it was negligent in order to prevent the right of indemnity, because obviously the jury in the *Hull* case did find that Cahill was guilty of some act of negligence. ▮▮▮ Such a finding of negligence does not *"ipso facto* preclude recovery of indemnity" because the duties owing from Cahill to Hull were not identical with those from Cahill to Clementina. (*Weyerhaeuser S.S. Co.* v. *Nacirema Co., supra,* 355 U.S. 563, 568.) The inquiry is directed, therefore, not to whether *any* negligence on the part of the person seeking indemnity proximately contributed to the injury, as in the application of the contributory negligence rule in negligence cases, but rather to the *sufficiency* of such negligence. (*San Francisco Unified Sch. Dist.* v. *California Bldg. etc. Co., supra,* 162 Cal.App.2d 434, 447.) ▮▮▮ Whether such negligence or fault is sufficient to preclude recovery is usually a jury question. (*Weyerhaeuser S.S. Co.* v. *Nacirema Co., supra,* 355 U.S. 563, 568; *San Francisco Unified Sch. Dist.* v. *California Bldg. etc. Co., supra,* 162 Cal.App.2d 434, 447; *Alisal Sanitary Dist.* v. *Kennedy, supra,* 180 Cal.App.2d 69, 79; *Pierce* v. *Turner,\* supra,* 205 Cal.App.2d 264, 268.)

In attempting to set a standard by which to guide the trier of fact in determining what conduct would preclude recovery for indemnity, the *San Francisco Unified Sch. Dist.* case reduced the factual determination to the ascertainment as to "whether the conduct . . . *helped* to bring about the damage" to the injured person. (P. 449; emphasis added.) In the instant case, the trial court adopted this language when it instructed the jury that Cahill could not recover if its conduct "helped bring about the damage complained of by William Hull. . . ." Webster defines the verb "help" to mean " [t]o aid; assist." Among its synonyms are: strengthen, support, sustain, and further. To help implies cooperation or a combination of effort. (Webster's Dictionary of Synonyms.) ▮▮▮ The crux of the inquiry is participation in some manner by the person seeking indemnity in the conduct or omission which caused the injury beyond the mere failure to perform the duty imposed upon him by law. (*San Francisco Unified Sch. Dist.* v. *California Bldg. etc. Co., supra,* 162 Cal.App.2d 434, 445; *Alisal Sanitary Dist.* v. *Kennedy, supra,* 180 Cal.App.2d 69, 79; *Phoenix Bridge Co.* v. *Creem,* 102

---

\*Cited as *Haines* v. *Pierce.*

App.Div. 354 [92 N.Y.S. 855].) The thrust of these cases is that if the person seeking indemnity personally participates in an affirmative act of negligence, or is physically connected with an act or omission by knowledge or acquiescence in it on his part, or fails to perform some duty in connection with the omission which he may have undertaken by virtue of his agreement, he is deprived of the right of indemnity. ▮▮ In other words, the person seeking indemnity cannot recover if his negligence is active or affirmative as distinguished from negligence which is passive. ▮▮ The courts of this state now recognize the distinction between active and passive negligence in holding that in the absence of express agreement for such indemnification the indemnitee may not recover from the indemnitor where he has been actively or affirmatively negligent. ( *Harvey Mach. Co.* v. *Hatzel & Buehler, Inc.*, 54 Cal.2d 445 [6 Cal.Rptr. 284, 353 P.2d 924] ; *Safeway Stores, Inc.* v. *Massachusetts Bonding & Ins. Co.*, 202 Cal.App.2d 99 [20 Cal.Rptr. 820].)

The evidence in this case unerringly points to participation on the part of Cahill which went beyond nonaction and the mere failure to perform the duty to Hull which the law imposed on Cahill, i.e., the failure to act in fulfillment of the duty of care which devolved upon it as a general contractor. ▮▮ The actions and knowledge of Larkin in the course and scope of his employment for Cahill are imputed to the latter. ▮▮ The ubiquitous Larkin was present on this job as general superintendent for Cahill from its inception. He was not only physically connected, as such superintendent, with the barricade in question by virtue of his knowledge and acquiescence in the manner and method of its construction, but he was affirmatively active in its construction. As such superintendent he ordered Cahill's employees, Dobson and Wellman, to the demolition job and the erection of the barricade. He directed that the barricade be constructed with Cahill's lumber. In the erection of the barricade he was acutely conscious of his obligation to protect Cahill's interests as well as those of Clementina, particularly the welfare of the tenants who were Cahill's responsibility. Under the state of the facts we are impelled to find that as a matter of law Cahill partook consciously and actively in the wrong to Hull. This is the only reasonable hypothesis that can be drawn from the evidence and the uncontradicted facts and the only conclusion which reasonable men could draw. Accordingly, the question as to whether Cahill actively participated in the affirmative act

of negligence which caused the injury to Hull should not have been submitted to the jury. (*Hicks* v. *Reis,* 21 Cal.2d 654, 660 [134 P.2d 788] ; *Di Muro* v. *Masterson Trusafe Steel Scaffold Co.,* 193 Cal.App.2d 784, 796-797 [14 Cal.Rptr. 551] ; *Winningar* v. *Bales,* 194 Cal.App.2d 273, 276 [14 Cal.Rptr. 908] ; and see 3 Witkin, Cal. Procedure, pp. 2251-2252.)

In reaching this conclusion we have not required the aid of appellant's assertion that Cahill has admitted as a matter of law, in its dismissed cause of action for indemnity against Larkin, that the latter was acting as its employee in the erection of the barricade. The allegation was there made that Larkin as its general superintendent negligently supervised the construction of such barricade so as to make him liable to his employer under the doctrine of *respondeat superior.* The trial court permitted the reading of said dismissed cause of action to the jury by counsel for the appellant during his argument to the jury over respondent's objection. ▮ In this state a superseded pleading is not an evidentiary admission which may be used as affirmative evidence, but it may be used as a prior inconsistent statement to impeach a party as a witness. (*Meyer* v. *State Board of Equalization,* 42 Cal.2d 376, 385 [267 P.2d 257].) ▮ On the other hand, a pleading in a prior action or in others which are pending may be offered either as an evidentiary admission against the pleader in a subsequent proceeding or for the purpose of impeachment. (*Meyer* v. *State Board of Equalization, supra,* p. 385.) ▮ While a dismissed cause of action against another party in the same action is not a superseded pleading in the strict sense, it would appear by analogy that it should be so treated and hence permitted only for impeachment purposes. In *Gajanich* v. *Gregory,* 116 Cal.App. 622 [3 P.2d 389], a dismissed cause of action against the sole defendant in the case was admitted for such purpose only. While no case has been cited or found in the instance of a cause of action dismissed against a defendant who is no longer a party in the case by virtue of the dismissal, we are of the opinion that under the familiar liberal rule permitting the pleading of inconsistent causes such an abandoned pleading in the same case should be treated in the same category as a superseded pleading. (See *Williams* v. *Seiglitz,* 186 Cal. 767, 773 [200 P. 635] (abandoned answer), and *Gajanich* v. *Gregory, supra,* 116 Cal.App. 622, cited by *Meyer* v. *State Board of Equalization, supra,* 42 Cal.2d 376, 385, in support of the rule that a superseded pleading may be offered for the purpose

of impeachment only. And see also Witkin, Cal. Evidence, pp. 251-252.) The dismissed cause of action, then, could have been presented to the jury for impeachment purposes only providing that it was properly admitted. In view of the rule that such a dismissed pleading is considered as a prior inconsistent statement, it could not be offered without a foundation being laid by questioning the witness to be impeached. (Code Civ. Proc., § 2052; Witkin, Cal. Evidence, p. 704; *Zanotto* v. *Marogna,* 124 Cal.App.2d .329, 331 [268 P.2d 826].) The abandoned pleading was first alluded to at the time of argument. No foundation for its admissibility was laid; therefore, the trial court should have sustained the objection to it. The error was of no moment, however, because as we have pointed out above the issue of indemnity should not have been submitted to the jury in any event.

### *The Instructions as to Burden of Proof*

In its complaint Cahill alleged in essence that Clementina was its subcontractor and as such solely responsible for the demolition work. Clementina, in its answer, denied that it was a subcontractor and asserted that Cahill and Clementina were joint venturers in the performance of the demolition work. These were the respective contentions as recognized by the pretrial order. The trial court gave a standard instruction to the jury that the respondent bore the burden of proving all the allegations in its complaint by a preponderance of the evidence. The propriety of this instruction is not questioned. The court further instructed the jury that the respondent bore the burden of proving that it entered into an oral contract with the appellant for the demolition of certain buildings and that the appellant entered into these contracts as an independent contractor and that the appellant breached the oral contract. The appellant does not challenge this instruction, but disputes a subsequent instruction which reads as follows: ''You are further instructed that among the allegations contained in the answer of the defendant Clementina Company, that is, the answer to the plaintiff's complaint, is that Clementina Company was not an independent contractor but instead entered into a joint agreement with Cahill Brothers to demolish the buildings in question and thus was engaged in a joint venture at the time of the accident in question to William Hull, and hence was not an independent contractor as alleged in plaintiff's complaint. *The burden of proving these allegations by a preponderance of evidence*

*is upon the defendant.''* (Emphasis added.) The court thus told the jury in one instruction that the plaintiff had the burden of proving that the defendant was an independent contractor, while in a subsequent instruction the court stated that the defendant bore the burden of proving it was *not* an independent contractor, but a joint venturer. There is an apparent inconsistency between these instructions.

 The respondent, in its complaint, presented the affirmative of the issue that appellant was an independent contractor. Appellant's answer that it was not an independent contractor was merely a denial of respondent's allegation. The burden of proof on this issue therefore devolved upon the respondent and remained upon it throughout the trial.

 All that was required of the appellant was to produce evidence sufficient to offset the effect of respondent plaintiff's showing; it was not required to offset it by a preponderance of the evidence. (*Scarborough* v. *Urgo,* 191 Cal. 341 [216 P. 584]; *Elcy* v. *Curzon,* 121 Cal.App.2d 280 [263 P.2d 86].)

 The questioned instruction also told the jury that the appellant had the burden of proving by a preponderance of the evidence that it was a joint venturer. Unless this allegation constitutes new matter it amounts to no more than a denial of the allegation in the complaint that the appellant was an independent contractor. The mere fact that an answer contains an affirmative allegation does not mean per se that it is setting up "new matter." An averment in the answer contrary to what is alleged in the complaint is equivalent to a denial. (*Trozera* v. *McDonell,* 131 Cal.App. 473, 475 [21 P.2d 706].) The basic consideration is whether the matters of defense are responsive to the essential allegations of the complaint, i.e., whether they are contradicting elements of plaintiff's cause of action or whether they tender a new issue, in which case the burden of proof is upon the defendant as to the allegation constituting such new matter. (*Rancho Santa Margarita* v. *Vail,* 11 Cal.2d 501 [81 P.2d 533].) The distinction is well stated by the leading case of *Frisch* v. *Caler* (1862) 21 Cal. 71, as follows: "Whether matter is new or not, must be determined by the matter itself, and not by the form in which it is pleaded—the test being whether it operates as a traverse or by way of confession and avoidance. A plea tendering no new issue, but controverting the original cause of action, is a mere traverse, and as nothing new is involved in it, to call it new matter would be a misapplication of terms. It is not essential

to a traverse that it be expressed in negative words—the form of the plea depending upon the allegation it is intended to meet; a negative allegation requiring an affirmative plea, and *vice versa*.　　　New matter involves of necessity a new issue, or the introduction of a new ingredient as the basis of one, and a new issue can only arise upon a plea of confession and avoidance.'' (P. 75.)

In the early case of *Goddard* v. *Fulton* (1863) 21 Cal. 430, the rule was stated thusly: ''If the answer, either directly or by necessary implication, admits the truth of all the essential allegations of the complaint which show a cause of action, but sets forth facts from which it results that, notwithstanding the truth of the allegations of the complaint, no cause of action existed in the plaintiff at the time the action was brought, those facts are new matter. But if those facts only show that some essential allegation of the complaint is not true, then such facts are not new matter, but only a traverse.'' (P. 436.) (Quoted by 2 Witkin, Cal. Procedure, p. 1524.)

　　　By its answer the appellant not only denied respondent's affirmative allegation that it was an independent contractor, but it responded with an affirmative allegation of its own, *i.e.*, that it was a joint venturer. If appellant showed that it is a joint venturer it showed that it was not an independent contractor, and therefore its affirmative allegation was but another traverse or denial of respondent's affirmative allegation. The appellant's answer contains no element of confession or avoidance, nor does it directly or by necessary implication admit the truth of respondent's allegation that Clementina was an independent contractor.

The trial court at respondent's request gave an instruction to the effect that if the jury found Clementina to be an independent contractor that then Clementina and Cahill could not at the same time be joint venturers. The court also instructed on the meaning and the elements of a joint venture. The relationship between the parties was the main feature of the case. The evidence here might have supported the finding of a joint venture in view of Larkin's close relationship with both Clementina and Cahill, his dual capacity, and the manner of their dealings. If the burden of proof were placed on the wrong party it could well have affected the outcome of the case.

　　　Respondent seeks to soften the impact of any error in the questioned instruction by urging that the evidence discloses as a matter of law that there was not a joint venture

because a sharing of the losses is a necessary element of a joint venture. While this is disputed by appellant, who asserts that an agreement to divide profits implies an agreement to share losses (citing *Martter* v. *Byers*, 75 Cal.App.2d 375, 384 [171 P.2d 101], and *Nels E. Nelson, Inc.* v. *Tarman*, 163 Cal. App.2d 714, 726 [329 P.2d 953]), and while we are of the opinion that the existence of a joint venture would be a factual question for the jury, it does not follow, as respondent contends, that the failure by appellant to establish a joint venture necessarily establishes the existence of an independent contractor relationship. As we have seen the issue of a joint venture was interposed to refute the existence of a principal-independent contractor relationship. While the appellant may have not been able to show the existence of a joint venture by a preponderance of the evidence, it might have shown by evidence equating that of the respondent that it was a joint venture, or in its attempt to so prove, establish that the relationship was that of principal and agent, a relationship which the jury might well have found under the facts of the instant case.

The respondent argues further that the existence of a joint venture would not, in any event, bar respondent's recovery because one joint venturer may recover from another for a breach of his duties to the joint venture. Respondent cites *Elsbach* v. *Mulligan*, 58 Cal.App.2d 354 [136 P.2d 651] as authority for this proposition. The *Elsbach* case did not involve an indemnity situation, but concerned itself with the right of one adventurer to recover damages against his co-adventurer for a wrong inflicted by the latter in the carrying out of their joint undertaking. It did not involve a situation where the two adventurers wronged a third party. The respondent here predicated his entire case upon the theory that the appellant was an independent contractor, which relationship the appellant sought to negate by attempting to show a joint venture. The jury was not instructed (nor did either side so request) upon the rule which would permit an adventurer to recover from his coadventurer where both were found liable for a wrong to a third party. It should be noted that all members of a joint venture are jointly liable for injuries resulting from the negligent conduct of one of the parties thereto because the negligence of one joint venturer or his employee acting in connection with the joint venture is imputed to the other joint venturers. (*Buckley* v. *Chadwick*, 45 Cal.2d 183 [288 P.2d 12, 289 P.2d 242]; *Leming* v. *Oilfields*

*Trucking Co.,* 44 Cal.2d 343 [282 P.2d 23, 51 A.L.R.2d 107] ; *Hupfeld* v. *Wadley,* 89 Cal.App.2d 171 [200 P.2d 564].)
In the case of joint venturers, however, each owes the same duty to the injured party as distinguished from the disproportionate duties owed to such party by the person seeking and the one resisting indemnity in the cases of contractual indemnity. Each member of a joint venture is the agent of the others in the venture's business transactions (*Engineering etc. Corp.* v. *Longridge Inv. Co.,* 153 Cal.App.2d 404 [314 P.2d 563]) ; the relationship is that of mutual agency, akin to a limited partnership. (*Leming* v. *Oilfields Trucking Co., supra,* 44 Cal.2d 343; *Campagna* v. *Market St. Ry. Co.,* 24 Cal.2d 304 [149 P.2d 281].) As between themselves their rights are governed by the same principles which apply to partnerships. (*Zeibak* v. *Nasser,* 12 Cal.2d 1 [82 P.2d 375] ; *Price* v. *Slawter,* 184 Cal.App.2d 715 [7 Cal.Rptr. 830].) The principle upon which the liability of a partnership for injuries to a third person rests is the same as that applicable to principal and agent and master and servant. (*Madsen* v. *Cawthorne,* 30 Cal.App.2d 124, 126 [85 P.2d 909] ; Civ. Code, § 2338; Corp. Code, §§ 15009, 15013.) A principal whose agent has committed a tort in the transaction of the business of the agency is jointly and severally liable to an injured party. Such liability is either predicated upon an act or omission of the agent which the principal directed or in which he participated; or it is imposed, where he did not so direct or participate, simply because of the responsibility cast upon him by law by reason of his relationship to his agent. In the former situation liability is fastened because of the principal's fault and, accordingly, he is not entitled to indemnification from the agent. In the latter situation, liability being imposed upon the principal not because of any fault on his part but solely because of his relation to the one personally at fault, he is entitled to indemnification from the erring agent. In this latter situation the liability of the principal is deemed secondary and that of the agent primary. (*Bradley* v. *Rosenthal,* 154 Cal. 420, 423 [97 P. 875] ; *Reynolds* v. *Lerman,* 138 Cal.App.2d 586, 595-596 [292 P.2d 559].) While, as we have discussed above, this case was tried upon the theory of contractual indemnity rather than upon the incidents of primary and secondary liability, it is apparent that had the appellant been able to establish a joint venture, it would only have been required to indemnify the respondent if the latter did not direct, or participate in, the act or omis-

sion on the part of appellant. ▮▮▮▮ We have already pointed out the nature and extent of the respondent's participation and its affirmative and active negligence.

The importance of the relationship between Cahill and Clementina cannot be discounted. The contradictory instructions on the burden of proof with respect to this relationship cannot be harmonized. They render it impossible to determine which of the conflicting rules presented to them was followed by the jury. Accordingly, the questioned instruction was not only erroneous but prejudicial.

The prejudicially erroneous instruction in and of itself would warrant a retrial of the case, but our conclusion that in any event no right of indemnity existed here as a matter of law requires a complete reversal of the case.

The judgment is reversed.

Bray, P. J., and Sullivan, J., concurred.

A petition for a rehearing was denied November 2, 1962, and respondent's petition for a hearing by the Supreme Court was denied December 5, 1962. White, J.,* participated therein.

---

*Retired Justice of the Supreme Court sitting pro tempore under assignment by the Chairman of the Judicial Council.