ROGERS, Respondent v. BLACK HILLS SPEEDWAY, INC.,
Appellant v. FERGUSON, Respondent
STEVEN KNIGGE, Respondent v. BLACK HILLS SPEEDWAY,
INC., Appellant v. FERGUSON, Respondent
DIANE KNIGGE, Respondent v. BLACK HILLS SPEEDWAY,
INC., Appellant v. FERGUSON, Respondent

(217 N.W.2d 14)

(File Nos. 11169-11171. Opinion filed April 16, 1974)
Order denying petition for rehearing May 9, 1974

Franklin J. Wallahan and Laurence J. Zastrow of Hanley, Wallahan, Murray & Zastrow, Rapid City, for appellant, Black Hills Speedway, Inc.

Curtis D. Ireland of Whiting, Lynn, Jackson, Shultz, Ireland & Lebrun, Rapid City, for respondents, Knigge, Knigge and Rogers.

Thomas E. Simmons of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for respondent, Ferguson.

DUNN, Justice.

Plaintiffs Diane Knigge, Steven Knigge and Patty Jean Rogers brought separate actions against the Black Hills Speedway, Inc., and were awarded judgments after a jury trial; Speedway has appealed from each of these judgments. As the appeals in the three actions involve common questions of fact and law, the cases have been, by stipulation and by order of this Court, consolidated for all purposes of appeal.

All three actions arose out of an accident which occurred on July 24, 1970 at the stock car racetrack owned and operated by Black Hills Speedway, Inc., hereafter referred to as Speedway. The track, located east of Rapid City, is a one-half mile, banked, oval racetrack used primarily for stock car racing, and open to the public for admission upon payment of a fee. On the west side of the track was a grandstand area capable of holding 2500 people, protected by a concrete wall and a 12-foot wheel fence. On the night in question, the crowd was estimated in the neighborhood of 3700 people, so that approximately 1200 of the people who purchased tickets had to be accommodated on the east side of the track. On the east side there was a wheel fence approximately 5 feet high at its beginning, going to 10 feet high and ultimately to 15 feet in front of the concession stand. Before each race night, and including the night of the accident portable benches were systematically lined up in rows behind this 15-foot wheel fence on the east side. Almost as systematically, and this from the testimony of Speedway employees only and including the owner, Mr. Davis, the benches were carried to points of vantage all along the east side of the track every evening for better viewing of the races. A consensus of the testimony produced by Speedway's witnesses would be that no great effort was made by the management to dissuade the spectators so long as they stayed out of the so-called restricted areas and stayed a reasonable distance (five or six feet) from the wheel fence. The particular area involved here, hereinafter referred to as the "designated area", is a short grass area behind the fence at Curve No. 2. This is not to be confused with a larger restricted "long grass" area at Curve No. 2, which was fenced off and where no spectators were allowed. The designated area was behind the fence and was completely accessible to spectators as there was no

fence or other obstruction, and no signs that it was a restricted area, or warning of danger in this area. Mr. Davis agreed that this area had been occupied by spectators every race night throughout the racing season, although he stated that whenever he noticed people in the area, he had ordered them moved out "but they came right back in". The Rapid City Merchant Police & Ambulance Co., hereafter referred to as Merchant Police, in charge of security, testified that it had no instructions from Mr. Davis to keep people out of the designated area on Curve No. 2, but only out of the restricted long grass area on this curve.

On the last (Feature) race of the evening, a car came into Curve No. 2, ran up over the bank, through the wheel fence and into the spectators in this designated area, causing the injuries complained of in these lawsuits. Speedway in each case sought indemnity or contribution from the Merchant Police in a third-party complaint. The third-party complaint alleged that the Merchant Police had entered into an oral contract with Speedway wherein for a valuable consideration the Merchant Police had undertaken the duties of policing the racetrack and keeping spectators out of dangerous areas, and that the Merchant Police had breached that duty by permitting the plaintiffs in this designated area where the accident occurred; that because of this breach of contract and negligent performance of its duties, the Merchant Police was legally obligated to indemnify Speedway and hold it harmless from any damages Speedway was required to pay to the plaintiffs; and in addition that if Speedway was guilty of any negligence, the negligence of the Merchant Police was disproportionate to that of Speedway and contribution was sought from the Merchant Police. After all of the evidence was in, the third-party complaint for indemnity and contribution was dismissed by the trial court.

Speedway's first assignment of error is directed to the dismissal of the third-party complaint against the Merchant Police.

On the question of indemnity the principles of law are set out in Degen v. Bayman, 86 S.D. 598, 200 N.W.2d 134:

> " 'Accordingly, it is generally held that a person who, without fault on his own part, has been compelled

to pay damages is entitled to recover indemnity where, as between the parties to the indemnity action, the defendant is primarily liable while the plaintiff is only secondarily liable—that is, where the plaintiff is only technically or constructively liable to the injured party, or where his liability was based on a legal or contractual relationship with the defendant. In other words, a joint tortfeasor may recover indemnity where he has only an imputed or vicarious liability for damage caused by the other tortfeasor.' " 41 Am.Jur.2d, Indemnity, § 20.

In discussing situations where a joint tortfeasor was actively negligent the Degen case went on to state:

"An act of omission as well as one of commission on the part of a joint tortfeasor contributing to the injury may constitute active negligence precluding his recovery of indemnity where he is under an affirmative duty to act. Bernstein v. El Mar Painting & Decorating Co., 13 N.Y.2d 1053, 245 N.Y.S.2d 772, 195 N.E.2d 456, and 41 Am.Jur.2d, Indemnity, § 21.

"If a person seeking indemnity personally participates in an affirmative act of negligence, or is physically connected with an act of omission by knowledge or acquiescence in it on his part, or fails to perform some duty in connection with the omission which he has undertaken, he is deprived of the right of indemnity. Cahill Brothers, Inc. v. Clementina Company, 208 Cal.App.2d 367, 25 Cal.Rptr. 301; Pearson Ford Company v. Ford Motor Company, 273 Cal.App.2d 269, 78 Cal.Rptr. 279."

In the light of these principles, we shall examine the negligence of Speedway, if any, considering only the testimony of the officers and employees of the Speedway corporation. 4 Am.Jur.2d, Amusements and Exhibitions, § 78, sets out the standards for the owner or operator of an automobile racetrack:

"The owner or operator of an automobile racetrack is not an insurer of the safety of his patrons, but he is charged with a duty to exercise reasonable care under

the circumstances to see that his premises are reasonably safe for spectators, such care being commensurate with the known or reasonably foreseeable dangers incident to racing motor vehicles at high speeds. This duty includes the erection of such fences or other protective devices between the track and the places assigned to spectators as will afford them reasonable protection. Liability may also be predicated upon improper construction or maintenance of the track, * * *."

George Davis, owner of Speedway, testified as a veteran racetrack owner, that he was fully aware of the danger at Curve No. 2 to any spectators sitting in the designated area. Thus the dangers inherent in Curve No. 2 to spectators in the designated area were foreseeable to the owner and operator of the track.

With this knowledge of the danger at Curve No. 2 to spectators in the designated area, he did not erect a fence or protective device; he did not erect signs advising spectators to stay out of the area; or signs even warning of the danger on Curve No. 2 in this area.

With full knowledge of the dangers at Curve No. 2 to spectators in the designated area, people were permitted to sit in this area race night after race night with only occasional warnings from the loud speaker to "move back" or to "keep away from the fences". This admitted negligence on the part of Speedway would deprive it of the right of indemnity. Clearly Speedway "personally participated in an affirmative act of negligence", or was "physically connected with an act of omission by knowledge or acquiescence in it on its part", and this admitted negligence was a proximate cause of the injuries here.

In addition to this, in order to support a complaint for either indemnity or contribution, there must be a showing of a breach of duty on the part of the Merchant Police. The oral contract is a little hazy as to the Merchant Police's duties, but it is agreed that they were first to act as parking attendants for automobiles in assigning parking areas until the race started; and again once the last race was completed. They were to control the drinking and fighting that seemed to be a part of this racing

crowd; and they were to keep people out of "hazardous areas". The question arises as to what "hazardous areas" were meant. Mr. Davis' testimony indicates that in his general conversation with Mr. Ferguson of the Merchant Police, that Curve No. 2 was mentioned, but of course Curve No. 2 included the restricted area which everyone agrees was off limits, as well as the designated area. Mr. Davis could not recall a single time when he had asked the Merchant Police to move the spectators out of the "designated area" although he knew they sat in this area every race night. 17 Am.Jur.2d, Contracts, § 75:

> "It is fundamental that no person may be subjected by law to a contractual obligation, unless the character of the obligation is definitely fixed by an express or implied agreement of the parties. In order to be binding, an agreement must be definite and certain as to its terms and requirements; it must identify the subject matter and spell out the essential commitments and agreements with respect thereto."

Viewing the evidence most favorable to the defendant Speedway, there was no credible testimony where the Merchant Police was explicitly told to keep spectators out of the designated area. Further, Mr. Davis admitted that he knew that spectators were seated in this area night after night. In Weeg v. Iowa Mutual Insurance Company, 82 S.D. 104, 141 N.W.2d 913, this Court stated that when a party has actual knowledge that a portion of a contract is not being complied with and makes no demand for compliance, by such conduct and inaction it can impliedly acquiesce to noncompliance.

Going to the one specific breach of duty complained of by Speedway where Mr. Watson, the Merchant Policeman assigned all alone to handle the entire east side of the track, had left his station on the east side before the last race was over and was on his way around to the parking lot on the west side where his after-race parking duties awaited him. At the precise moment of the accident, he was having a cup of coffee with another Merchant Policeman at the concession stand on the west side of the track.

Mr. Watson's leaving his station before the last race was over, was not a proximate cause of any injuries here. The spectators in the designated area had been there since 6:30; some of them had family picnics there. All of this happened in full view of the management and without any attempt to remove them; this in accordance with management policy for the entire racing season. By Mr. Davis' own testimony, if Mr. Watson had moved the people out of the area, they would have immediately moved back in; and in fact there is no testimony from anyone that the plaintiffs were ever requested to leave this designated area. What possible action Watson could have taken had he been on station to avoid the injuries under the situation as it existed there that evening has not been explained by anyone. If these people were to be removed from the designated area, they should have been removed before the first race and not in the middle of the last race. Watson was the only man on the east side. He had a duty to handle traffic on the west side of the tracks when the last race was completed. More men had been requested by Davis to properly control the crowd, and the request had been refused. There was a carnival atmosphere at the Speedway this evening. There was drinking and fighting and firecrackers being exploded. Watson had been involved in one major altercation on the east side between the "Cowboys" and the "Hippies" and had cleared the area of the "Hippies" with some aid from the "Cowboys".

[3] The defendant has failed to show the breach of any contractual duty by Watson that would justify contribution. The trial court properly dismissed the third-party complaint for indemnity and contribution from the Merchant Police.

The second contention is that the trial court erred in not directing a verdict for the defendant Speedway.

As indicated above, George Davis, as a veteran racetrack owner, testified that he was aware of the dangers to spectators in the designated area at Curve No. 2. Yet he erected no fence or barriers or warning signs in this area to advise spectators of his special knowledge. In addition people were permitted to sit in this area race night after race night with no sustained effort to keep them out. This was evidence of negligence on the part of Speedway which was a proximate cause of the injuries complain-

ed of; however, Speedway argues that its motion for directed verdict should have been granted because the plaintiffs assumed the risk of injury by taking a position near Curve No. 2 to watch the races and, incidentally, that they had lost their status of invitees by sitting in this particular area.

■ Where a spectator "is familiar with motor vehicle races and voluntarily occupies a dangerous place, he assumes the risk of injury. However, he does not assume the risk of injury where the danger is not obvious to one of ordinary intelligence or where he occupies a place which he had no reason to believe was unsafe." 61A C.J.S. Motor Vehicles § 582.

Thus it has been held that a member of a sports car club sitting on a turn protected only by a snow fence, assumed the risk of injury. Morton v. California Sports Car Club, 163 Cal.App.2d 685, 329 P.2d 967.

Also a former race announcer in the Pit area where he knew he did not belong, assumed the risk of injury. Shula v. Warren, 395 Pa. 428, 150 A.2d 341, and a knowledgeable customer with a "pit pass" who went to unprotected areas assumed the risk of injury. Tatum v. Clemones, 105 Ga.App. 221, 124 S.E.2d 425.

However, regular spectators at a racetrack did not assume risk of a flying wheel where no warning was given of this danger and no showing that they had ever witnessed a wheel go into the spectators on prior occasions. Alden v. Norwood Arena, 332 Mass. 267, 124 N.E.2d 505. Also a spectator who had never attended a sports car race before, who was standing behind a snow fence in an area where spectators were permitted, did not assume risk of injury. Goade v. Benevolent and Protective Order of Elks, 213 Cal.App.2d 189, 28 Cal.Rptr. 669.

■ The fair tenor of these cases would indicate that a spectator only assumes the risk when he has special knowledge of danger in a particular area and still insists on sitting there; or deliberately goes into obvious danger areas such as the track or the pit areas.

Here, each of the plaintiffs paid the admission price and was directed to the east side area, as the grandstand was filled; the

designated area was filled with people when they arrived, including families having picnics on blankets, and at least one playpen where infants were placed while the parents enjoyed the races; there was no fence or barrier; no signs indicating danger or warning them to keep out; the bench that the Knigges were seated on was in the area when they arrived and they moved it 10 or 12 feet back away from the fence. The evidence is undisputed that this area was filled with spectators race night after race night with only occasional warnings from the public address system to "keep away from the fences". The Knigges, as rather faithful followers of the track, knew this, and also knew that while there had been accidents on this curve before, no car had ever come up over the bank in their experience; they were not race specialists and had no special knowledge of the dangers of such a curve. [1] The Rogers girl had never been to a race before and only followed the crowd into the area where the accident occurred and without any warning from anyone that this was a particularly dangerous place to watch the race.

Under the circumstances it is clear that the plaintiffs did not lose their status of invitees by sitting in a "non-spectator" area. There was nothing to set this area apart from the entire east side of the track where several hundred people had been sent by the management to view the races; nor did they assume any risk that would bar recovery by sitting in this area where the track owner, with special knowledge of the danger in this area, had not seen fit to fence or warn people of possible danger or to keep people out of during the entire racing season.

Speedway contends that the question of assumption of risk and whether plaintiffs were invitees or licensees should have been presented to the jury under certain offered instructions. We have reviewed the trial court's instructions and find that they fully, fairly, and understandably state the law as it applies to the facts of this case. The trial court did not err in denying the motion of the defendant Speedway for a directed verdict, and the case was submitted to the jury under proper instructions.

---

1. Mr. Davis testified that while automobiles had started up the bank on several occasions, none had ever gone over the bank in his sixteen years' experience. However, as a veteran track operator, he was aware of this potential danger.

■ Finally, Speedway contends that the trial court erred in not granting a mistrial because of a so-called "golden rule" argument by the plaintiffs' attorney. Plaintiffs' attorney made some statement in his closing argument to the effect that if the jurors were in his office and slipped and fell, that they could reasonably expect to be compensated for their injuries. Unfortunately the entire argument was not taken down and the context in which this statement is made would be of great importance. It could well be only an analogy to explain the rights of a business invitee. The trial judge was there and heard the argument and he is given wide discretion in deciding whether arguments of counsel were prejudicial. "An appellate court should interfere only when from an examination of the entire record, it is convinced that there has been a miscarriage of justice." Binegar v. Day, 80 S.D. 141, 120 N.W.2d 521. The jurors were instructed to disregard remarks of counsel not supported by the record, and there is nothing in the size of the verdict that would indicate any passion or prejudice arising from the final argument. We find no error in the trial court's failure to grant a mistrial.

Judgments in all three cases are affirmed.

WINANS and DOYLE, JJ., CONCUR.

BIEGELMEIER, C. J., and WOLLMAN, J., dissent.

BIEGELMEIER, Chief Justice (dissenting).

The opinion appears to hold that Speedway cannot recover indemnity or contribution against third-party defendant James Ferguson (Merchant Police) for the reason that his agents " 'personally participate[d] in an affirmative act of negligence' ", etc., under Degen v. Bayman & Outboard Marine, 86 S.D. 598, 200 N.W.2d 134. Additionally, the affirmance is based on the ground that as a matter of law there is "no credible testimony" that Ferguson (Merchant Police) was "explicitly" told to keep spectators out of the designated area. I believe there was sufficient evidence on the contribution theory (see SDCL 15-8-15) to submit to the jury the question of duty and violation thereof.

As to the Knigge plaintiffs, it appears that they were regular attendants at the races, having attended some ten times;

therefore, defendant's proposed Instruction No. 13, which was South Dakota Pattern Jury Instruction No. 13.01, on the assumption of risk should have been given. This does not apply to plaintiff Rogers as she had not attended a race before, and not having prior knowledge of the danger cannot be held to have assumed the risk.

The majority opinion mentions that Speedway complains that the question of assumption of risk should have been presented to the jury, but it does not state that the only possible instruction involving assumption of risk was Instruction No. 10, which provided as follows:

> "A speedway operator owes its spectators the duty of exercising ordinary care to keep its premises in a reasonably safe condition for use by its spectators and to warn them of dangerous conditions upon the premises which are known or should be known to it but not known to its spectators.
>
> "The foregoing rule does not require, however, that the speedway operator guarantee the safety of its customers.
>
> "Before the speedway operator can be held liable for injuries to its spectators as a result of a dangerous condition on its premises, it is necessary that it have knowledge of the presence of the dangerous condition."

In my opinion Instruction 10 does not take the place of an instruction on the assumption of risk by the Knigges; it deals with the duty of a speedway operator and not with assumption of risk by plaintiffs.

Under this reasoning, it appears that the failure to give an instruction on the assumption of risk as to the Knigges requires reversal of the judgments as to them; however, the Rogers' judgment should be affirmed. The directed verdict in favor of Merchant Police on the contribution theory should be reversed.

I am authorized to state that Justice Wollman joins in this dissent.