[Civ. No. 22071. First Dist., Div. One. Dec. 3, 1965.]

GREAT WESTERN FURNITURE CO., INC., OF OAK-
LAND et al., Plaintiffs and Respondents, v. THE POR-
TER CORPORATION et al., Defendants and Appellants.

Carl Hoppe, John R. Murtha, Hoppe & Mitchell and Hoppe, Mitchell, Murtha & Anderson for Defendants and Appellants.

Carroll, Davis, Burdick & McDonough and J. D. Burdick for Plaintiffs and Respondents.

SULLIVAN, P. J.—In this action for declaratory relief and indemnity, defendant The Porter Corporation (Porter) appeals from a judgment after a nonjury trial in favor of plaintiff Great Western Furniture Co., Inc. of San Francisco (Great Western) and against Porter in the sum of $15,227.91 and costs.

On August 26, 1955, Great Western and Porter entered into a written contract pursuant to which Porter agreed to install, manage and supervise a so-called Thrift Club in Great Western's stores and to employ, manage and supervise all personnel employed by Great Western for the operation of the Thrift Club departments. Upon execution of the contract Porter installed the Thrift Club in Great Western's San Francisco store and appointed a manager to operate it. Eventually Edward McDowell, who had been associated with Porter for a number of years, was appointed manager. Under the terms of the contract Porter had charge of the complete operation of the club, including the selection, training, supervision, disciplining and discharge of the personnel em-

ployed by Great Western for the operation of its Thrift Club department. Although Great Western had the privilege of talking to these employees and of making suggestions to Porter if dissatisfied with anyone, it had nothing whatsoever to do with their selection, training or discipline. As to the relationship between Great Western and the employees selling Thrift Club memberships, Sidney Porter, executive vice-president of Porter, testified that it was "McDowell's job to handle those without giving any problems to the store [Great Western]."[1]

One of these employees was Albert Gorges, who was selected and hired by McDowell. Sometime later, McDowell learned that Gorges was not performing satisfactorily his duties as a collection agent for the Thrift Club. In substance the complaints were that Gorges was "a little hard to keep track of"; that he had some drinking problems; that he was "rough," "a little rough in his language" and "insistent" in making collections; and that he had failed to account for the full amount collected. There was evidence that McDowell informed Mr. Porter of Gorges' failure to remit collections but at no time brought to Great Western's attention any of the complaints he had received about such employee.

On November 15, 1956, while making a collection for the Thrift Club, Gorges assaulted and injured Alexander Nizuk. On December 5, 1956, Nizuk commenced an action for damages against Gorges, Great Western Furniture Company, Inc. of *Oakland*[2] and Porter in the San Francisco Superior Court (action No. 464221). In that action, after all amended pleadings were filed, Nizuk alleged that at the time of the assault Gorges was the servant, agent and employee of Great Western and Porter and was acting within the course and scope of said agency and employment.[3] On February 17, 1958, Nizuk filed

[1] To avoid confusion with the corporate defendant (Porter) we will refer to the individual as Mr. Porter or Sidney Porter.

[2] Hereafter referred to as Great Western of *Oakland*. As previously noted we will refer to respondent on this appeal as Great Western or Great Western of *San Francisco*.

[3] The original complaint in action No. 464221 named as defendants Gorges, Great Western Furniture Company, Inc. of Oakland, and other persons designated by fictitious names. On May 27, 1957, Great Western of Oakland filed an answer. On November 7, 1957, an amended complaint was filed against the same defendants but alleging therein that Porter was one of the defendants sued under a fictitious name. On December 19, 1957, Porter filed an answer together with a cross-complaint against Gorges and Great Western of Oakland. On February 3, 1958, Great Western of Oakland filed an answer to the cross-complaint.

a second amended complaint naming as defendants Gorges, Great Western of Oakland, Great Western of San Francisco and Porter, and containing the allegation previously noted as to the agency and employment of Gorges. On February 28, 1958, Porter filed an answer to said second amended complaint denying the material allegations thereof, and an ''Amended Cross-Complaint for Recoupment'' against Gorges, Great Western of Oakland and Great Western of San Francisco. On March 12, 1958, Great Western of *Oakland* alone filed an answer to said cross-complaint denying all the allegations thereof.[4]

On April 18, 1958, Porter moved for a summary judgment.[5] On the hearing of the motion, one of the counsel then representing Great Western and now representing it on this appeal appeared and opposed the motion.[6] On July 15, 1958, the superior court entered a summary judgment in favor of Porter, which by its terms not only dismissed Nizuk's complaint and amended complaints as against Porter but also dismissed the cross-complaint and the amended cross-complaint of Porter against Gorges and Great Western. This was in accord with Porter's motion that ''Concurrently only with the dismissal of said action'' against Porter, the court ''dismiss its Cross-Complaint and its Amended Cross-Complaint on the ground that the issues therein pleaded will have become moot.'' On May 9, 1960, the summary judgment was affirmed on appeal by this court in *Nizuk* v. *Gorges* (1960) 180 Cal.App.2d 699 [4 Cal.Rptr. 565].[7]

On September 19, 1960, counsel representing Great Western of Oakland and Great Western of San Francisco in action No. 464221 demanded in writing that Porter ''appear for and defend them in the said litigation and pay any judg-

---

[4]The county clerk's file in action No. 464221 was admitted in evidence in the trial of the instant case. It discloses no answer by Great Western of *San Francisco* to either the original or any amended complaint and no answer by Great Western of Oakland to any amended complaint. Nor does it disclose any answer by Great Western of *San Francisco* to Porter's cross-complaint or amended cross-complaint. No issue has been raised on this appeal concerning this hiatus in the pleadings.

[5]Notice of this motion was given to plaintiff Nizuk and defendants Gorges, Great Western of Oakland and Great Western of San Francisco.

[6]Said counsel, Mr. McDonough, stated: ''Your Honor, I am a co-defendant. I represent the Great Western Furniture Company. Actually, my interest in opposing counsel for summary judgment is that I don't want to see my client left in here alone. . . .'' We observe that the transcript of such oral proceedings merely refers to Great Western Furniture Company without any distinction as to the Oakland or San Francisco corporate entity.

[7]No petition for a hearing by the Supreme Court was filed.

ment which might be rendered against them," stating that in the event of Porter's failure or refusal to do so, said defendants "will look to you for all of their damage . . . including . . . all attorneys' fees and court costs. . . ." The demand was based on Porter's alleged liability under the contract of August 26, 1955.[8] Upon Porter's rejection of the demand, the instant action (San Francisco Superior Court action No. 504482) was commenced on October 13, 1960, by Great Western against Porter.[9]

Action No. 464221 proceeded to trial against Great Western in May 1961 and, after four and a half days of trial but before its conclusion, was settled by Great Western. On June 12, 1961, a dismissal with prejudice signed by Nizuk and his counsel was filed.

The complaint for declaratory relief filed by Great Western in the instant action (No. 504482) is in two counts. The first count, after referring to the contract of August 26, 1955, and to the commencement of Nizuk's action for damages (No. 464221) alleges in substance that as a result of such action Great Western was required to retain defense counsel and that if Great Western should be held liable to Nizuk therein "then all of said damage will result solely by reason of the negligence and carelessness" of Porter in their management and supervision of the Thrift Club and its employees, including Gorges. The second count, after incorporating by reference most of the allegations of the first, alleges in substance that, in the event Great Western should be held liable, "all the said damage will result solely from the failure of said defendants to properly perform their undertakings to employ, manage and supervise the said Albert Gorges, all in breach of their contractual undertaking so to do."

The trial court found, in substance so far as is here pertinent, that, pursuant to the contract entered into between

---

[8] The basis of the demand was that "it appears that any liability which might ever be visited upon my clients by reason of the conduct of Mr. Gorges could arise only out of your failure to perform your duties under that contract and your negligence and carelessness in carrying out your obligations thereunder, . . ."

[9] Actually the present action was commenced by Great Western Furniture Co., Inc., of Oakland and Great Western Furniture Co., Inc. of San Francisco as plaintiffs against The Porter Corporation and Louis Porter as defendants. Eventually plaintiff Great Western of Oakland and defendant Louis Porter were dismissed from the action (see fn. 10, *infra*).

Great Western of San Francisco[10] and Porter on August 26, 1955, the latter took complete charge and management of the Thrift Club; that, although McDowell was paid by Great Western, his management and supervision of the club was conducted under the direction and on behalf of Porter; that Great Western at no time managed or supervised the Thrift Club but relied on Porter; that McDowell and Mr. Sidney Porter hired Gorges, and McDowell subsequently became aware of the latter's shortcomings heretofore mentioned; that they decided nevertheless to retain him in the employ of the Thrift Club; that at no time did McDowell discuss with anyone in Great Western the information he had received about Gorges; that the Nizuk action (No. 464221) was commenced and proceeded to final disposition as we have outlined above; and that by reason thereof Great Western suffered specified damages.

From such findings the court concluded that Porter was negligent in retaining Gorges in its employ; that such negligence was a breach of its duties to Great Western under the written contract; that implied in said contract "was a promise by the Porter Corporation to perform its managing agents' functions in a reasonable and nonnegligent manner and to hold the Great Western Furniture Co., Inc. harmless from any damages it may be required to pay because of any breach of contract by the Porter Corporation"; that Porter's defense of res judicata and the statute of limitations were without merit; and that Great Western was entitled to judgment against Porter in the sum of $15,227.91. Judgment was entered accordingly.

 Porter contends that the summary judgment entered in the first action (No. 464221) and affirmed on appeal by this court (*Nizuk* v. *Gorges, supra,* 180 Cal.App.2d 699) is res judicata on the issue of liability in the present action. We cannot agree. Whether the doctrine of res judicata is considered in its primary aspect as a merger or bar, or in its secondary aspect as a collateral estoppel (see *Panos* v. *Great Western Packing Co.* (1943) 21 Cal.2d 636, 637-638 [134 P.2d 242]; *Dillard* v. *McKnight* (1949) 34 Cal.2d 209, 214 [209 P.2d 387, 11 A.L.R.2d 835]; *McDougall* v. *Palo Alto etc. School Dist.* (1963) 212 Cal.App.2d 422, 428 [28 Cal.Rptr.

---

[10]The findings of fact, conclusions of law and judgment are in favor of Great Western of San Francisco alone. The conclusions recite that by agreement of the parties plaintiff Great Western of Oakland and defendant Louis Porter "are to be dismissed from the action."

37] ; *Saunders* v. *New Capital for Small Businesses, Inc.* (1964) 231 Cal.App.2d 324, 330 [41 Cal.Rptr. 703]), the general rule is that there must be an identity of the parties to the actions before the doctrine can become operative. (Code Civ. Proc., §§ 1908,[11] 1910; Rest., Judgments, §§ 68, 79; 3 Witkin, Cal. Procedure (1954) p. 1955; see *Standard Oil Co.* v. *J. P. Mills Organization* (1935) 3 Cal.2d 128, 139 [43 P.2d 797].) Code of Civil Procedure section 1910 provides: "The parties are deemed to be the same when those between whom the evidence is offered were on opposite sides in the former case, and a judgment or other determination could in that case have been made between them alone, though other parties were joined with both or either."

■ In applying the doctrine of res judicata, the law is clear that "Parties to a judgment are not bound by it, in a subsequent controversy between each other, unless they were adversary parties in the original action." (1 Freeman on Judgments (5th ed. 1925) § 422, p. 918; *Victor Oil Co.* v. *Drum* (1920) 184 Cal. 226, 239 [193 P. 243]; *Standard Oil Co.* v. *J. P. Mills Organization, supra,* 3 Cal.2d 128, 139-141; Rest., Judgments, § 82; Code Civ. Proc., § 1910.) ■ Ordinarily, therefore, where the plaintiff and defendant in the subsequent action were merely codefendants in the original action, the prior judgment cannot be used by one against the other as an estoppel since they were not adversary parties in the original action and no issues were raised or adjudicated *between* them therein. (*Robson* v. *Superior Court* (1915) 171 Cal. 588, 594-595 [154 P. 8]; *Victor Oil Co.* v. *Drum, supra,* 184 Cal. 226, 239; *Standard Oil Co.* v. *J. P. Mills Organization, supra,* 3 Cal.2d 128, 139-141; *County of Los Angeles* v. *Continental Corp.* (1952) 113 Cal.App.2d 207, 222-223 [248 P.2d 157]; *Atherley* v. *MacDonald, Young & Nelson* (1955)

---

[11]Code Civ. Proc., § 1908 provides in relevant part: "The effect of a judgment or final order in an action or special proceeding before a court or judge of this state, or of the United States, having jurisdiction to pronounce the judgment or order, is as follows: ... 2. In other cases, the judgment or order is, in respect to the matter directly adjudged, conclusive between the parties and their successors in interest by title subsequent to the commencement of the action or special proceeding, litigating for the same thing under the same title and in the same capacity, provided they have notice, actual or constructive, of the pendency of the action or proceeding."

This section is merely declaratory of the common-law rule of res judicata. (*Bartlett Hayward Co.* v. *Industrial Acc. Com.* (1928) 203 Cal. 522, 535 [265 P. 195].)

135 Cal.App.2d 383, 385-386 [287 P.2d 529]; *Truck Ins. Exchange* v. *Torres* (1961) 193 Cal.App.2d 483, 493 [14 Cal. Rptr. 408]; *Vegetable Oil Products Co.* v. *Superior Court* (1963) 213 Cal.App.2d 252, 256 [28 Cal.Rtpr. 555]; 1 Freeman, *op. cit.*, § 424, pp. 920-922; 3 Witkin, Cal. Procedure (1954) pp. 1955-1956; Rest., Judgments, § 82;[12] Code Civ. Proc., § 1910.)

Taking up the contention here made, it is clear that Great Western and Porter, the opposing parties in the instant action, were not adversaries in the original action brought by Nizuk, but were codefendants on one side of the case resisting the claim of Nizuk on the other. The summary judgment in that action was not rendered *between* Great Western and Porter but between Nizuk and Porter, determining that *as between the latter two adversary parties* there was no triable issue of fact. (Code Civ. Proc., § 437c; see *Snider* v. *Snider* (1962) 200 Cal.App.2d 741, 747-748 [19 Cal.Rptr. 709].) Proceedings for the summary judgment were set in motion only by Porter and their end result culminating in the judgment now invoked meant only that Porter's supporting affidavits or depositions stated facts sufficient to sustain a judgment *in favor of Porter against Nizuk* and that Nizuk failed by counteraffidavits to proffer competent and sufficient evidence to present a triable issue of fact. (*Coyne* v. *Krempels* (1950) 36 Cal.2d 257, 261 [223 P.2d 244]; *Burke* v. *Hibernia Bank* (1960) 186 Cal.App.2d 739, 744 [9 Cal.Rptr. 890]; *Snider* v. *Snider, supra.*)

The oral argument of Great Western's counsel, Mr. McDonough, presented at the hearing of the motion for summary judgment did not enlarge the scope of the ensuing summary judgment so as to make it an adjudication of any issues between Great Western and Porter. In reality, his remarks were legally meaningless since whether Porter was entitled to a summary judgment against Nizuk was to be determined through the media of the affidavits of those two parties. (*Burke* v. *Hibernia Bank, supra*; *Snider* v. *Snider, supra.*) Much less was Great Western, as Porter now argues, charged with the responsibility of presenting in the summary judgment proceedings the claim made in the instant action

[12]Rest. Judgments, § 82 states: ''The rendition of a judgment in an action does not conclude parties to the action who are not adversaries under the pleadings as to their rights inter se upon matters which they did not litigate, or have an opportunity to litigate, between themselves.''

that Porter was negligent in the hiring and supervision of Gorges. This was a basis of liability which Nizuk failed to assert or rely upon as a triable issue of fact, thus suffering the consequences of a dismissal as against Porter. The raising of this issue was Nizuk's responsibility, not Great Western's.

Nor did the summary judgment adjudicate any issue between Great Western and Porter because of the cross-complaint filed by Porter against Great Western and Gorges praying that, if Nizuk obtained any judgment against Porter, the latter have judgment against Great Western and Gorges for such amount.[13] Any issue thus raised between Porter and Great Western was never adjudicated because upon Porter's ''concurrent'' motion its cross-complaint was dismissed. No claim is, or could be, made that the summary judgment determined any issue raised by the cross-complaint. Nor can Porter now complain that it lost the opportunity to litigate the issues raised by the cross-complaint. Successful on its motion for summary judgment, it brought about the dismissal of the cross-complaint itself. Porter would both eat its cake, and have it.

Porter relies on *Fidelity & Casualty Co. of New York* v. *Federal Express* (6th Cir. 1943) 136 F.2d 35 and *Bradley* v. *Rosenthal* (1908) 154 Cal. 420 [97 P. 875, 129 Am.St.Rep. 171]. The former case is distinguishable from the one before us. There the plaintiff insurance company sought indemnity for the payment of a judgment in a prior action for wrongful death in which plaintiff's two insureds and defendant and its employee were all codefendants and in which a verdict was returned against plaintiff's insureds but in favor of the other two defendants. Fidelity was held estopped by the prior judgment because the two sets of defendants had actually litigated the issue of negligence with each other, each claiming that the death was caused by the other's sole negligence. (See Rest., Judgments, § 82.) *Bradley, supra,* is not in point and did not involve res judicata. There in a single trial the jury returned what appeared to be a stultifying verdict, exonerating an agent but holding the principal liable.

---

[13]Porter's cross-complaint, after referring to Nizuk's claim against Porter, alleged in substance that at the time of the assault and battery by Gorges, Porter was managing Great Western's Thrift Club department; that Gorges was collecting outstanding accounts for Great Western in connection with the Thrift Club; and that Great Western was paying Gorges directly his entire compensation for such services.

■ The next contention on appeal is grounded on the dismissal with prejudice signed by Nizuk and filed in June 1961 upon Great Western's settlement of the first action. Porter argues that all of the parties thereby "proclaimed on the record" that there was no merit in that case; that such dismissal constituted a judgment exonerating both Gorges, as the actor, and Great Western as the indemnitee; that this "prior adjudication" is binding on Great Western in the instant action; and that, Great Western, "a mere volunteer so far as the dismissal of Georges [*sic*] was concerned," thereby caused a judgment to be entered absolving such actor and should not now be permitted to claim indemnity against Porter. The argument is entirely without merit. Great Western was not a volunteer but settled Nizuk's claim for $10,000 under the compulsion of a pending suit. (*Pacific Tel. & Tel. Co.* v. *Pacific Gas & Elec. Co.* (1959) 170 Cal.App.2d 387, 392 [338 P.2d 984]; *Safeway Stores, Inc.* v. *Massachusetts Bonding & Ins. Co.* (1962) 202 Cal.App.2d 99, 115-116 [20 Cal. Rptr. 820].) As Great Western properly points out, the requiring of a dismissal with prejudice in connection with such settlement is a common and accepted method of terminating the litigation so as to protect the defendants. Since Porter refused to assume the defense for Great Western in the original action, the latter remained in full charge of that action and was entitled to make a good faith settlement without prejudicing its right to be indemnified. (*Pacific Tel. & Tel. Co.* v. *Pacific Gas & Elec. Co., supra*; *Safeway Stores, Inc.* v. *Massachusetts Bonding & Ins. Co., supra.*)

■ It is next urged that since Great Western in answering Porter's cross-complaint in the original action (No. 464221) failed to set up a counterclaim for indemnity, it was thereafter barred from seeking indemnity in the instant action by virtue of the provisions of Code of Civil Procedure section 439.

Section 439 provides: "If the defendant omits to set up a counterclaim upon a cause arising out of the transaction set forth in the complaint as the foundation of the plaintiff's claim, neither he nor his assignee can afterwards maintain an action against the plaintiff therefor." ■ As we said in *Saunders* v. *New Capital for Small Businesses, Inc. supra*, 231 Cal.App.2d 324, 333-334: "This section embodies a special aspect of the doctrine of res judicata [citation] and represents a statutory extension of collateral estoppel [citation].

Its effect is this: If a claim arising out of the same transaction on which the complaint is based and tending to diminish or defeat the plaintiff's recovery is not pleaded as a counterclaim, it is forever barred. [Citations.]''

Great Western seems to question the availability of a counterclaim as a responsive pleading to a cross-complaint. Its reference to Witkin (2 Witkin, Cal. Procedure (1954) p. 1578) is not supportive of this proposition and has been taken out of context. It seems to us that, as Porter argues, when a cross-complaint has been filed and ''served upon the parties affected thereby . . . such parties may demur or answer thereto, . . . as to the original complaint.'' (Code Civ. Proc., § 442.) It follows therefore that the answer of a cross-defendant, like that of a defendant, ''shall contain: . . . (2) A statement of any new matter constituting a . . . counterclaim.'' (Code Civ. Proc., § 437.)

While Great Western's answer to Porter's cross-complaint contained no counterclaim, procedures were always open to said party under which it could amend its answer to include a counterclaim. (Code Civ. Proc., § 473.) However, Great Western was foreclosed from thus setting up any counterclaim by Porter's own act in causing a voluntary dismissal of the cross-complaint within a short time after the answer thereto was filed.[14] Assuming that Great Western's claim for indemnity which is the basis of the instant action (No. 504482) was properly assertible as a transaction counterclaim in the original action (No. 464221) we hold that Great Western's present action is not barred by Code of Civil Procedure section 439 because Porter by dismissing its own cross-complaint prevented Great Western from filing a counterclaim and thus precluded section 439 from becoming operative. Otherwise Great Western's right to amend under Code of Civil Procedure section 473 would be nullified.

Contrary to Porter's argument, the facts of the instant case do not bring it within the holding of this court in *Datta v. Staab* (1959) 173 Cal.App.2d 613 [343 P.2d 977] where the original action was settled and a dismissal with prejudice filed. In that case we said: ''Appellant asserts that a volun-

[14]As pointed out *supra*, on March 12, 1958, Great Western filed an answer to the cross-complaint; on April 18, 1958, Porter moved for summary judgment and for dismissal of its cross-complaint if it obtained summary judgment. The motion was heard on May 20, 1958, but summary judgment was not entered until July 15, 1958.

tary dismissal has only the effect of a withdrawal of the plaintiff's claim; that it leaves the defendant as though he had never been a party. *This is undoubtedly true where plaintiff has received nothing in return for the dismissal.* [Citations.] The effect of a dismissal with prejudice is quite different, however, when it is executed and filed in return for a *consideration* moving from the defendant. . . . We accordingly hold, that in this state a dismissal after issues are joined, executed in return for a *consideration* moving from the defendant and which is to operate as a *retraxit,* is not only res judicata as to the claims of the plaintiff but as a result of the provisions of Code of Civil Procedure, section 439, it operates also as a collateral estoppel—a bar to any claim which defendant could have asserted in said action as a counterclaim arising out of the same transaction. Since it is within the exclusive power of the defendant to bring about such result by the settlement of plaintiff's claim, such a rule would appear to be just and in harmony with the objectives of the statute in question." (Italics added; pp. 620-621.)

In the original action (No. 464221) engaging our attention there was no compromise settlement of Porter's cross-complaint, no dismissal with prejudice of the cross-complaint either in return for a consideration moving from Great Western or otherwise. The dismissal was Porter's voluntary act and was not a result brought about by Great Western.

We take up Porter's contention that Great Western cannot, upon a theory of implied indemnity, recover damages against Porter because the wrongful act giving rise to such damages was done by Gorges who was allegedly Great Western's own employee. It is argued that in the first action (No. 464221) Great Western was charged with liability for the assault committed by its employee Gorges under the doctrine of *respondeat superior;* that according to the language of our opinion in *Nizuk* v. *Gorges, supra,* 180 Cal.App.2d 699, "Gorges' contract of employment was with Great Western, which reserved the right to terminate his services at any time" (p. 706) and that these facts appearing in such opinion "stand uncontradicted in the present record"; and that no reported case has ever applied the doctrine of implied indemnity to make an award in favor of a master for a wrong done by his own servant.

However, the established existence of an employer-employee relationship between Great Western and Gorges is but

an assumption on Porter's part. Nowhere in the pleadings filed in the first action does Great Western admit such relationship (see fn. 3, *ante*). The answer filed by Great Western of Oakland on May 27, 1957, to Nizuk's original complaint denies such relationship and while, as stated previously, the county clerk's file discloses no answer by Great Western of San Francisco to either the complaint or the amended complaint (see fns. 3 and 4, *ante*), we are satisfied that the above relationship was in issue between Nizuk and Great Western. The pretrial conference order filed thereon on December 16, 1960, after this court's decision in *Nizuk* v. *Gorges, supra,*[15] clearly shows that one of the issues in the case about to be tried was "whose employee or agent was Georges [*sic*] ?"[16] As previously set forth, this issue was not determined in the trial of the first action which was terminated by a compromise settlement after Porter rejected Great Western's written demand that the former appear and defend the latter.

Nor was an employer-employee relationship between Great Western and Gorges established against Great Western in the prior appeal. Great Western was not a party to such appeal (see fn. 15, *ante*) and the opinion filed therein from which Porter now seeks to draw support did not establish the law of the case with any binding effect on Great Western. (See 3 Witkin, Cal. Procedure (1954) p. 2419.) We have already explained that the summary judgment in favor of Porter and against Nizuk, which was affirmed on such appeal, was not res judicata of the issue of liability in the instant case.

This issue of liability and the included issue of *respondeat superior* were decided favorably to Great Western in the

[15]As stated *supra, Nizuk* was decided on May 9, 1960. Although the decision appears *sub nomine* Nizuk v. Gorges et al., neither Gorges nor Great Western were parties to the appeal, the only respondent therein being Porter.

[16]The pretrial conference order states in relevant part: "The issues are: . . . (3) Respondeat superior. The question is whose employee or agent was Georges [*sic*]? It is the contention of the plaintiff in this present action that he was an employee of the defendant Great Western Furniture Company, Inc., of San Francisco and Great Western Furniture Company, Inc. of Oakland. Plaintiff contends that when the District Court of Appeal decided the case of *Nizuk* v. *Gorges* [180 Cal.App.2d 699 (4 Cal.Rptr. 565)], it established the law of the case and established the fact that by that the Great Western Companies were the employers of Georges [*sic*]. Defendants, Great Western Companies contend that this is not so. That they were not appellants in that case nor respondents on appeal. In addition, Great Western has another action but not consolidated with this one whereby it seeks indemnity against Porter Corporation."

action now before us. Under the 1955 contract between the parties it was Porter, not Great Western, who had complete charge of the entire Thrift Club operation, including the employment, management and supervision of all of its personnel, Gorges among them. As the trial court found, Porter installed McDowell as its manager of the Thrift Club and although he was on Great Western's payroll, all of his management, supervision and discipline came from Porter pursuant to the terms of the contract. As we point out, *infra,* there is ample evidence in the record to support the trial court's finding that "At no time after the creation of said Thrift Club in August of 1955 did the plaintiff Great Western Furniture Co., Inc. of San Francisco undertake to, nor did it, manage, control, supervise, discipline or otherwise deal with any of the employees operating said Thrift Club, but in all such respects relied upon The Porter Corporation to completely manage and control said Thrift Club and all of its employees, in all respects, including their employment, training, management, supervision, discipline, discharge, and so forth." It is not disputed that Gorges was included among these employees.

In *Cahill Bros., Inc.* v. *Clementina Co.* (1962) 208 Cal.App.2d 367, 375-376 [25 Cal.Rptr. 301], this court in an opinion authored by Justice Molinari had occasion to review and summarize the basic principles of implied indemnity thusly: "The right to implied indemnity, while relatively recent in the law of California, is now well established. [Citations.] The distilled essence of these cases is that where each of two persons is made responsible by law to an injured party the one to whom the right of indemnity inures is entitled to shift the entire liability for the loss to the other party. Accordingly, a right of implied indemnification may arise as a result of contract or equitable considerations. [Citations.] It appears, at first blush, that the rationale of the cases which have considered the right of implied indemnity rests upon a difference between the primary and secondary liability of two persons each of whom is made responsible by the law to an injured party. [Citations.] A closer scrutiny discloses, however, that where the right of implied indemnity rests upon a *contractual* relationship between the person seeking and the one resisting indemnity it is not necessary or appropriate to apply the theories of primary or secondary liability. (*Ryan Co.* v. *Pan-Atlantic Corp., supra,* 350 U.S. 124, 133 [76 S.Ct. 232, 100 L.Ed. 133]; *Weyer-*

*haeuser S.S. Co.* v. *Nacirema Co., supra,* 355 U.S. 563, 569 [78 S.Ct. 438, 4 L.Ed.2d 491]; *San Francisco Unified Sch. Dist.* v. *California Bldg. etc. Co., supra,* 162 Cal.App.2d 434, 447 [328 P.2d 785].)'' ▮▮ As Justice Peters pointed out for this court in *San Francisco Unified Sch. Dist.* v. *California Bldg. etc. Co.* (1958) 162 Cal.App.2d 434, 444-449 [328 P.2d 785], after a detailed review of the *Ryan, Weyerhaeuser* and other cases, and as we again pointed out in *Cahill Bros.,* where the right of implied indemnity arises from a contractual relationship between the indemnitor and the indemnitee, it is predicated upon the indemnitor's breach of such contract, the rationale of the cases being that a contract under which the indemnitor undertook to do work or perform services necessarily implied an obligation to do the work involved in a proper manner and to discharge forseeable damages resulting from improper performance absent any participation by the indemnitee in the wrongful act precluding recovery. (See *San Francisco Unified Sch. Dist.* v. *California Bldg. etc. Co., supra; Cahill Bros., Inc.* v. *Clementina Co., supra,* at pp. 376-380; *Alisal Sanitary Dist.* v. *Kennedy* (1960) 180 Cal.App.2d 69, 78-80 [6 Cal.Rptr. 379]; *Montgomery Ward & Co.* v. *KPIX Westinghouse Broadcasting Co.* (1962) 198 Cal.App.2d 759, 761-762 [18 Cal.Rptr. 341].)

▮▮ The rationale of these cases, and of the decisions analyzed therein, is applicable here. As we observed in both *San Francisco Unified Sch. Dist.* v. *California Bldg. etc. Co., supra,* 162 Cal.App.2d 434, 447, and *Cahill Bros., Inc.* v. *Clementina Co., supra,* 208 Cal.App.2d 367, 380, we need not in the instant matter evaluate factors of ''primary'' or ''secondary'' negligence since our proper and pertinent inquiry is whether there was here a breach of a contractual obligation owing from Porter to Great Western. It is manifest that there was. Under the 1955 contract, Great Western had nothing to do with the control and supervision of the Thrift Club personnel. It was Porter who had complete charge of their employment, supervision and discharge. The effect of this arrangement was to create a special relationship between Gorges and Porter as a result of which the former was acting exclusively under the management and control of Porter when he committed the wrongful act in question. Even though Gorges remained on Great Western's payroll, Porter had in reality assumed the role of a special employer thus exonerating Great Western from liability under the doctrine of *respondeat*

*superior* for the conduct of a person over which it exercised no control.

Porter breached the obligations thus assumed by it. Having selected and hired Gorges, Porter learned that he was not performing his duties satisfactorily and was guilty of misconduct in the respects heretofore outlined by us. Nevertheless it retained Gorges among the Thrift Club personnel. As we think the trial court properly concluded, Porter was negligent in thus retaining Gorges in the Thrift Club department when, knowing what it did about him, it had good reason to conclude that he was irresponsible and likely to cause harm to others in performing his duties as a collector. It was this negligence that constituted a breach by Porter of the 1955 contract and gave rise to an implied indemnity. Great Western's right to indemnification was not precluded by any participation in Gorges' wrongful act. Liability for such act is not fastened upon it by the doctrine of *respondeat superior,* as Porter now argues, because it was Porter, not Great Western, who had complete control of the employee in question.

Contrary to Porter's claim, the foregoing conclusions reached by us are not in conflict with our holding in *Cahill Bros.* or the conclusion arrived at in *Horn & Barker, Inc.* v. *Macco Corp.* (1964) 228 Cal.App.2d 96 [39 Cal.Rptr. 320], which followed *Cahill Bros.* In the former case, Cahill entered into a contract with the Clementina Co. for demolition work to be done by the latter. In the course of the work, a third person was injured as a result of the negligence of Larkin who was acting for both parties in a dual capacity, being the general superintendent of Cahill and the responsible and managing officer of Clementina. We held that Cahill was not entitled to indemnity against Clementina because ''The actions and knowledge of Larkin in the course and scope of his employment for Cahill are imputed to the latter'' (208 Cal.App.2d at p. 382) and Cahill, acting through Larkin, ''actively participated in the affirmative act of negligence'' causing the injury. In *Cahill Bros.*, there was an unquestioned employer-employee relationship between Cahill and Larkin which made *respondeat superior* operative. In the instant case, Great Western did not act affirmatively either through Gorges or McDowell so as to participate actively either in Gorges' wrongful act or McDowell's negligence in retaining Gorges as a collector. Great Western had nothing to do with the Thrift Club personnel who remained under the complete control of Porter.

The present case is also clearly distinguishable from *Horn & Barker, Inc.* v. *Macco Corp., supra,* 228 Cal.App.2d 96. There the plaintiff, which was engaged in the business of leasing and renting construction equipment, leased and rented to the defendant contractor certain machinery and furnished an operator therewith. One of the defendant's employees was injured as the result of the negligence of plaintiff's employee who was operating the equipment. The plaintiff sought indemnity from the defendant for damages paid the latter's injured employee, claiming that defendant had assumed full and exclusive control of the machine and of the operator. However, plaintiff also alleged that its liability as determined by the judgment rendered against it in the action brought by the injured employee " 'resulted from no actual fault of, or misfeasance by, plaintiff, but arose only *because of a responsibility imposed on plaintiff by law; as the alleged general employer of Kostka; for the negligent acts and omissions of Kostka during the time Kostka was operating said machine,* as hereinbefore described.' (Italics added.)'' (228 Cal.App.2d at p. 99.) The insufficiency of plaintiff's complaint to state a cause of action was upheld on appeal[17] because plaintiff pleaded not only an existing employer-employee relationship between it and the tortfeasor but such a relationship that posited the proper application of the doctrine of *respondeat superior.* In a word, plaintiff acknowledged active negligence properly imputed to it. ''Once it was established that plaintiff was responsible for the active negligence of its employee Kostka which was at least *one* of the proximate causes of the accident, the right to indemnity was foreclosed. . . . [T]he character of the negligence of an employee which is imputed to his employer is not transmuted by the exercise of the imputative process. Imputed liability is not the equivalent of liability arising from passive negligence.'' (228 Cal. App.2d at pp. 103, 106.) In the case now before us, as we have pointed out, such a relationship between Great Western

---

[17]In *Horn & Barker, Inc.* v. *Macco Corp., supra,* 228 Cal.App.2d 96, dismissal of the complaint upon the sustaining of defendant's demurrer without leave to amend was affirmed on appeal by a divided court. Justice Ashburn, in his dissent, felt that ''the proffered amended complaint fairly alleges that Kostka was at the moment of the accident acting exclusively under orders of defendant in committing the unlawful and negligent act that precipitated the accident, and that defendant was then neglecting its duty of furnishing its employee Carnahan a safe place to work. From this it follows that the special employer and not the general employer was liable to persons injured thereby.'' (P. 111.)

and either Gorges or McDowell was never admitted, adjudicated in the first action, or established as a matter of law in the instant one.

Finally, Porter contends that ''the critical finding of breach of duty'' on its part is not supported by the record. The gist of the argument is that the record does not justify ''shifting McDowell's knowledge of George's [sic] habits from Great Western, the actual employer of McDowell and Georges [sic] to Porter who at most was a supervisory agent directly over McDowell.'' In essence Porter's position is that ''McDowell's knowledge was imputed to his employer Great Western . . .'' citing *Cahill Bros.*

It thus appears that Porter persists in its basic assumption that Great Western, rather than itself, was the person in complete charge and control of the Thrift Club and therefore the one charged with the knowledge of Gorges' previous misconduct. As we have already pointed out, Great Western had nothing to do with the Thrift Club operation and complete charge of its personnel, as the evidence shows, rested with Porter, not Great Western. Appellant attempts to overcome this situation, or at least to ignore its implications, by referring to Great Western as the ''actual employer'' of both McDowell and Gorges. Having posited such a relationship, it then attempts to bring the instant case within our holding in *Cahill Bros.* by asserting that McDowell's knowledge is necessarily imputed to Great Western. We have already pointed out the distinction between the two cases.

It is of course beyond dispute that such knowledge was acquired by McDowell. But the latter was Porter's manager, carrying out Porter's obligations under the contract and his knowledge was imputed to Porter. It was therefore not an indispensable condition to fastening liability on Porter, as appellant seems to think, that McDowell's knowledge be communicated to Mr. Porter. But there is testimony in the record by McDowell that he discussed with Mr. Porter the failure on Gorges' part to remit collections and that ''anything that was out of a routine nature other than a routine nature I would discuss with him.'' Appellant makes much of Mr. Porter's testimony that the latter did not recall receiving reports from McDowell about having trouble with Gorges but it is to be noted that nowhere did Mr. Porter *deny* that he had knowledge of Gorges' misconduct.[18] We are satisfied that the

[18]The following pertinent testimony elicited by Great Western's counsel, Mr. Burdick, from the witness Mr. Porter on examination under

record contains sufficient evidence to support the finding that Porter had the complete management and control of the Thrift Club personnel and, acting through its manager McDowell, failed to discharge this responsibility in a proper manner.

The judgment is affirmed.

Molinari, J., and Sims, J., concurred.

A petition for a rehearing was denied December 27, 1965, and appellants' petition for a hearing by the Supreme Court was denied January 26, 1966.