[Civ. No. 18751. Third Dist. Feb. 11, 1981.]

CITY OF SACRAMENTO, Cross-complainant and Appellant, v.
GEMSCH INVESTMENT COMPANY et al.,
Cross-defendants and Respondents.

COUNSEL

Memering & DeMers, Henry W. Crowle and Claudia J. Robinson for Cross-complainant and Appellant.

Panattoni, Westley, Farrell & Callahan, David E. Davies, Miller, Good & Ford and Richard E. Good for Cross-defendants and Respondents.

OPINION

CECCHETTINI, J.*—The briefs of all parties show no significant factual dispute for the purposes of this appeal.

The appellant, City of Sacramento (City), appeals from judgments granting separate motions of respondents Gemsch Investment Company, Vandenberg Motors, and ABC Supply Inc., for summary judgment. The motions were coordinated and based on essentially the same grounds and facts.

The plaintiff, Minnie M. Myers, slipped on some droppings (date palm nuts or seeds) on a sidewalk on the east side of 28th Street between J and K Streets in the City of Sacramento, on January 29, 1977, and suffered injuries. The sidewalk was covered with the seeds and had not been cleaned for five years. The City holds an easement over the sidewalk and asserts ownership of the palm trees which produced the seeds. The City is responsible for their inspection and maintenance, and an ordinance prevents removal or pruning by others.

Plaintiff claimed injuries and sued the City, Gemsch, ABC Supply, Vandenberg, and Sac-Cal Auto. The City cross-complained against Gemsch, ABC Supply, Vandenberg and Sac-Cal Auto for indemnity. The City owns the easement, as stated. Gemsch is the adjacent owner, Vandenberg a lessee, and ABC a sublessee. Sac-Cal Auto, a geographically remote occupier of adjoining land, was removed by summary judgment on May 30, 1978.

In March 1979, all defendants (including respondents), except City, compromised the plaintiff's claims, settled with her for $15,000, and re-

_____
*Assigned by the Chairperson of the Judicial Council.

ceived releases and a dismissal of the action. The negotiations to settle had reached a stage where plaintiff would accept $20,000 for *all* claims against *all* parties, and respondents requested appellant City to join in the settlement and pay one-third; after City refused, the above-mentioned compromise was reached.

The City had certain ordinances in effect on the accident date. Appellant's amended opening brief cites three sections, 38.71, 38.74, and 35.5(a), but the language therein quoted for section 38.71 differs from a printed sheet in the clerk's transcript which we shall use and which we quote as follows:

"Sec. 38.71 *Owners to repair defective sidewalks.* Any person owning real property in the city shall repair any defective sidewalk lying in front of or along the side of his property. (Ord. No. 428, § 1.)

"Sec. 38.72 *Tenants to notify city engineer of defective* sidewalk. Any tenant of real property in the city shall report to the city engineer in writing the fact that any defective sidewalk exists in front of or along the side of the property occupied by him. (Ord. No. 428, § 2.)

"Sec. 38.73 *Enforcement of article.* The city manager, through the proper departments, shall enforce this article. (Ord. No. 428, § 4.)

"Sec. 38.74 *Liability for injuries where repair or report not made.* If, in consequence of any sidewalk being defective and in condition to endanger persons passing thereon, any person, while exercising ordinary care to avoid the danger, who [*sic*] suffers damage to his person or property through any defect of a sidewalk may have recourse for damages thus suffered against the person failing to repair such defect or the person failing to report the defect. (Ord. No. 428, § 5.)

"Sec. 38.75 *Defects caused by tree roots.* In the event that the defect is caused by a tree root, the city engineer shall have power and authority to cut such root or to give permission to cut the same; provided, however, that if such root be other than a surface root, the city engineer shall consult the director of the department of recreation and parks concerning same. (Ord. No. 428, § 6.)

"Sec. 38.76 *Purpose of article.* It is not the intent of any of the provisions of this article to change the procedure concerning sidewalk repairs

set forth in the Improvement Act of 1911, but to provide alternative and supplementary procedure. (Ord. No. 428, § 7.)"

Appellant also cites the following ordinance: "*§ 35.5(a)*

"It shall be the duty and responsibility of all property owners to maintain the grounds of maintenance strips on the owners' property regardless of whether such property is developed. This maintenance shall include watering as needed and keeping such strips free from weeds and *any obstructions contrary to public safety . . .* [Italics added]."

After settling with plaintiff, respondents successfully moved for summary judgment, as stated. The basis of their motions was that the settlement in good faith was a bar to appellant's cross-complaint for indemnity under Code of Civil Procedure section 877, subdivision (b)[1] as extended by *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899] (hereinafter *AMA*). This appeal follows the granting of said motions.

## I

Appellant contends that its cross-complaint should go to trial on the theory of "total indemnity," not equitable indemnity in its post-*AMA* form of comparative partial indemnity. It argues that neither Code of Civil Procedure section 877 nor *AMA* precludes such indemnity where the alleged indemnitee (City) and indemnitors have an "implied contract." Therefore it states, the trial court erred in determining as a matter of law that the settlement by respondents with plaintiff precludes full indemnity on the cross-action.

Appellant reaches this result by claiming the above-cited City code sections constitute a "contract between the City and the party to whom

---

[1]Code of Civil Procedure section 877 provides: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—

"(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and

"(b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors."

it applies." The result, according to appellant, is a right to full indemnity.

A reading of the ordinances cited shows a duty on adjacent owners to repair defective sidewalks (§ 38.71) and a duty on tenants to notify the city engineer of a defective sidewalk. (§ 38.72.) Section 38.73 allows the city engineer to enforce the provisions and cites Ordinance No. 428, § 4, which is not before us but which presumably tells the engineer what he can do. Section 38.74 purports to give a cause of action to an aggrieved person against the defaulting owner or tenant. Section 38.76 states that the purpose of the ordinances is to provide alternative and supplementary procedure to the Improvement Act of 1911. And the other section relied on by appellant, section 35.5(a), requires the property owners to maintain "the grounds of maintenance strips on the owners' property." There is nothing in the record to show that the subject slip and fall occurred on anything but a sidewalk, so section 35.5(a) is presumably used by appellant for comparative analysis only.

Appellant cites two cases for its proposition that the ordinances constitute a contract with the applicable party. The first is *Tuolumne County etc. Co.* v. *Sonora* (1916) 31 Cal.App. 655 [161 P. 128]. The facts of that case show it is inapplicable. The electrical company sued the City of Sonora for electricity consumed in street lights between 7 a.m. and 4:30 p.m., alleging that such current was furnished at the City's request. The evidence showed that the City had expressly notified the company that it would pay only for electricity between 4:30 p.m. and 7 a.m. There was an ordinance, but this was part of the notice and arrangement by which the power company supplied electricity. There is no logical relationship between *Tuolumne* and the case at bench.

Second, appellant cites *City & County of S.F.* v. *Ho Sing* (1958) 51 Cal.2d 127 [330 P.2d 802], which holds that both a city and the adjacent owner are liable for dangerous conditions on a sidewalk of which they had notice, but that where the adjoining property owner places in a public street or sidewalk some artificial structure and a city pays damages to one injured thereby, the city has a right to recover the amount from the property owner by way of indemnity. The case deals with (1) an artificial condition created and maintained by the property owner, and (2) equitable indemnity before *AMA*. It does not mention "implied contract." In fact, the real basis is not clear or even mentioned. The court took pains, however, to point out (*id.*, at p. 138) that in allowing

indemnity "we do not mean that the city's liability to the injured member of the public is merely dependent or derivative and not joint or direct." The case was decided just after Code of Civil Procedure section 875 became law.

There is thus nothing in the two cases cited by appellant to even remotely suggest that there is such a "contract" as would give appellant a right of indemnity akin to contractual or statutory indemnity.

The ordinances do not expressly state what appellant claims, nor can one rationally construe them so. Their declared purpose is to augment the Improvement Act of 1911, which presumably is the vast and historic division 7 of the Streets and Highways Code, section 5000 et seq. Nor can they unilaterally create a "contract."

Appellant cites two other cases to bolster its argument that indemnity herein "rests upon an implied contractual relationship." First, *Great Western Furniture Co. v. Porter Corp.* (1965) 238 Cal.App.2d 502 [48 Cal.Rptr. 76], which found contractual indemnity against an alleged indemnitor, but where respondeat superior was held to impute the requisite consensual obligation to the indemnitor. Second, *Cahill Bros., Inc. v. Clementina Co.* (1962) 208 Cal.App.2d 367 [25 Cal.Rptr. 301], where the consensual requisite was found in a contractor-subcontractor setting. These are instances of implied in fact contracts, and do not assist appellant. (See *Great Western, supra*, at pp. 516, 517.)

There is nothing factually present that gives rise to a contractual relationship. There is no contractual or statutory right in appellant to indemnity.

## II

Appellant also argues that *AMA* did not repudiate the full implied indemnity theory and suggests that applications such as *Gardner* v. *Murphy* (1975) 54 Cal.App.3d 164 [126 Cal.Rptr. 302][2] are untouched by *AMA*. While it is true that *AMA* did not expressly repudiate the

---

[2]This pre-*AMA* case involved a buyer of real property suing the seller and the seller's real estate broker for rescission and damages on the ground that the broker represented the existence of an easement, when in fact the parcel was landlocked. The broker cross-complained against the seller for indemnity, alleging that the seller had told him the easement existed and that he (the broker) had relayed the information to buyer. The

concept of equitable indemnity where the alleged indemnitor's negligence versus the indemnitee's fault was passive/active, negative/positive, or secondary/primary, nevertheless the court left little doubt where it stood. (See *AMA, supra*, 20 Cal.3d at pp. 583, 594-597.)

The City's conduct in this case, in *Gardner* terms, was primary, although possibly passive, which suggests the linguistic difficulties prior to *AMA*. The City had a duty to inspect and maintain the trees from which the seeds fell, and there was an ordinance preventing removal or pruning by others. The City also had a duty to prevent a dangerous condition of which it had notice. The failure to exercise its duty would be a breach of a primary duty occurring passively rather than by affirmative act. Substantively, there is no reason to make such distinctions. Whatever the nature of the relative faults, whatever the quantum, it is measurable under *AMA*.

There are some reported decisions since *AMA* that have a bearing on this subject. First, *Safeway Stores* v. *Nest-Kart* (1978) 21 Cal.3d 322 [146 Cal.Rptr. 550, 579 P.2d 441], follows *AMA*, and holds that equitable indemnity as modified by the partial indemnity doctrine permits apportionment on a comparative fault basis between a *strictly* liable defendant and a *negligent* defendant. Obviously, under *Gardner, supra*, the distinction would allow full indemnity to the often passive defendant who is strictly liable. But *Safeway* states otherwise.

Two other cases, with strong dissents, concern a special relationship (attorney-client and negligence) that results in a successive act and not a "true joint tortfeasor status." (See *Commercial Standard Title Co.* v. *Superior Court* (1979) 92 Cal.App.3d 934 [155 Cal.Rptr. 393], and *Gibson, Dunn & Crutcher* v. *Superior Court* (1979) 94 Cal.App.3d 347 [156 Cal.Rptr. 326].) These cases can be viewed as limited and applying to a special relationship.

The case at bench is a prime example of the dilemma facing counsel for alleged indemnitors. With the impetus of Code of Civil Procedure

seller's general demurrer was sustained without leave, and broker appealed from the resulting dismissal.

The Court of Appeal reversed on the indemnity cause, holding a cause was stated. Thus, if broker could prove the alleged misrepresentations were based solely on what seller provided him, he could receive indemnity. The court used the passive/secondary versus the active/primary approach. This decision was after *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], and emphasizes analysis of the "character or kind" of wrong attributed to the tortfeasors.

section 877 as broadened by *AMA*, settlement is made without a recalcitrant codefendant, then settlors are faced with litigation to determine whether there is some trace of *Gardner* left. Where the transaction rests upon related facts, either concurrent or successive, joint or several, which legally create a detriment compensable against multiple actors, the right of indemnity should follow *AMA* guidelines, unless a contract or statute otherwise provides.

*AMA* may not have completely abolished implied equitable indemnity in its traditional sense (see Rest.2d Torts, § 886B), but it severely modified one application of it, namely, the passive/active, primary/secondary approach. The instant case shows why it should be absorbed into the new comparative indemnity of *AMA*. The City had a separate but concurrent duty to trim or remove trees and to prevent a dangerous condition of which it had notice. There is no evident equity in favor of the City to allow full indemnity.

The Restatement Second of Torts section 886B, comment f, mentions a landowner's liability for indemnity to a city where he allows a sidewalk to fall into disrepair and where he has a duty created by legislative enactment (also, see Rest., Restitution (§ 95, illus. 2 and 3)), but there is little authority or reason to support its application here. The ordinances do not expressly create a right to indemnity nor do they seek to eliminate City's liability for its own fault, and thus need not be tested against the State Tort Claims Act, Government Code section 810 et seq.

Further, pertinent language of Code of Civil Procedure section 877 does not help the City. The clause therein "to one or more of a number of tortfeasors claimed to be liable for the same tort" is broad, not limiting. It does not say "joint tortfeasors," or parties who are governmental entities, or who are passive/negative/secondary. Equitably interpreted, this broad language includes such alleged tortfeasors. Therefore, the conduct of the City was and should be measurable under *AMA* tests.

It follows from the foregoing that there is no equitable indemnity available to appellant because the settlement by respondents precludes it. There is no triable issue.

## III

■ Appellant raises for the first time on appeal that the settlement between plaintiff and respondents was not in good faith, but offers nothing factually to support the contention. Appellant states in its brief only that the suggested allocation of plaintiff's offer was "unreasonable," yet there were three categories of liability. It states there was no notice to appellant of the dangerous condition, but there is evidence, as stated, that for five years the date droppings were never removed. Against this, we have before us the uncontradicted declarations of the attorneys for respondents. There is no merit to appellant's contention.

Moreover, the matter should have been tried in the trial court as set forth in *Fisher* v. *Superior Court* (1980) 103 Cal.App.3d 434 [163 Cal.Rptr. 47]. We should not review the matter here. (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337 [303 P.2d 738].)

## IV

Respondents claim this is a frivolous appeal and it was brought to delay. The questions unanswered by *AMA*, regarding the *Gardner*-type of equitable indemnity, are of sufficient importance that fees or penalties should not be imposed.

The judgments entered after granting said motions for summary judgment, are affirmed. Respondents shall have costs.

Reynoso, J., concurred.

**PARAS, Acting P. J.,** Dissenting.—I cannot agree that *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal. Rptr. 182, 578 P.2d 899], abrogated the equitable indemnity doctrine. Inter alia I note that were that the intention of the Supreme Court, it could so easily have been stated. Instead, the opposite was voiced. "[W]e conclude that the current equitable indemnity rule *should be modified* to permit a concurrent tortfeasor to obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis." (Italics added. 20 Cal.3d at p. 598.)

Moreover, the same equitable considerations which originally brought the total indemnity principle into being compel its continuation as a

doctrine separate and distinct from that of comparative indemnity. Where one who has committed no affirmative wrongful act is caused to incur liability by the act of another, justice demands total indemnity. The most simple and obvious example of course is that of a landowner whom the law holds liable for a dangerous condition on his property created by someone else. Why should equity not forthrightly continue to assess the full loss upon the latter? I do not read *American Motorcycle* as declaring otherwise; nor do I read its partial indemnity doctrine, with its ramifications, as achieving the same result.

Total equitable indemnity should not be foreclosed by the "good faith" settlement of an active wrongdoer and the injured party, leaving the latter free to pursue his claim further against factually innocent, yet remedyless, persons. Without reaching the merits of the cross-complaint here, I dissent from the majority holding and would reverse the summary judgment, thus permitting the appellant to attempt to bring itself within the total indemnity doctrine.

A petition for a rehearing was denied March 13, 1981. Paras, J., was of the opinion that the petition should be granted.